Clarence WISE, Jr., Petitioner,

v.

The Honorable Tim MURPHY and The Honorable Alfred Burka, Respondents.

John DOE, Petitioner,

v.

The Honorable Tim MURPHY, Respondent.

Nos. 4480 Original, 5456.

District of Columbia Court of Appeals.

Argued en banc Oct. 21, 1970.

Decided March 16, 1971.

2. Now the Public Service Commission.

Norman Lefstein, Washington, D. C., with whom Matthew Zwerling, Washington, D. C., was on the petitions, for petitioners.

Earl J. Silbert, Atty., Dept. of Justice at the time of argument, with whom Thomas

A. Flannery, U. S. Atty., John A. Terry and John O'B. Clarke, Jr., Asst. U. S. Attys., and Frederick D. Hess and Carl S. Rauh, Attys., Dept. of Justice, were on the opposition to petitioners' memorandum of law, for respondents.

Warren R. King, Asst. U. S. Atty., also filed an appearance for respondent in No. 5456.

Before HOOD, Chief Judge, and KELLY, FICKLING, KERN, GALLAGHER and NEBEKER, Associate Judges, sitting *en banc.**

NEBEKER, Associate Judge:

These consolidated cases are before the court on petitions for extraordinary relief in the nature of prohibition. Because of the importance of the constitutional issue presented, we, sua sponte, ordered *en banc* consideration.[1] That constitutional question is whether, absent facts warranting formal arrest for rape, a person identified from photographs as the possible perpetrator may be required by court order and under other constitutional safeguards[2] to stand in a lineup to be viewed by the victim.

In both cases, the District of Columbia Court of General Sessions judge, sitting as a magistrate,[3] has issued a summons and an order requiring the subjects to appear before him, with counsel, or for the appointment of counsel, and to set a time and date for the lineup. The summonses also informed the subjects of the date and time of the offense. The affidavits submitted by the Government were furnished to the subjects and their counsel.

Under the contemplated lineups, it is clear that if identified, the person will be arrested and dealt with according to law.[4] If not identified, protective measures have been ordered insulating the event from future public and official notice.

It is apparent from the transcript in the John Doe case that discovery of far greater magnitude than ordinarily required will be given before the contemplated lineup. Appointed counsel requested, and the Assistant United States Attorney agreed, that he be furnished with previous statements of description by the victims and any other witnesses to the offense, and that he be permitted to interview such persons before the lineups. All statements made at the lineups will be recorded with a view to permitting verbal reconstruction and eliminating the possibility that counsel may also have to be a witness at any future proceedings. At oral argument before this court, the United States also agreed that, as usual in lineups in the District of Columbia, photographs of the lineups will be made, and the names and addresses of all participants will be kept for possible visual reconstruction of the lineups.

In addition, when questioned as to the nature of the lineup and potential future harm in the event of negative results, the United States, at oral argument, acknowledged that it could arrange a lineup with-

---

\* Associate Judges Pair, Reilly and Yeagley were not members of the court at the time of argument and did not participate in the consideration or decision of these cases.

1. D.C.Code 1967, § 11–705(b) (2) & (3) (Supp. III, 1970).

2. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).; Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

3. Under Section 111 of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No.91–358, 84 Stat. 473, approved July 29, 1970, the Court of General Sessions has ceased to exist and the Superior Court of the District of Columbia, a court of general jurisdiction, has replaced it. However, under that Act, complete transfer of jurisdiction to the Superior Court will not occur until August 1, 1972. The offense of rape, with which these petitions deal, remains for the time within the jurisdiction of the United States District Court and as to such offense the respondent judges remain in the same legal capacity.

4. *See* note 11 *infra.*

out using convicted or suspected prisoners together with the necessary security safeguards and devices. It also agreed that nothing resulting from such lineup need be used officially in any other way. Thus, the lineup need not be photographed for use in connection with any other proceeding concerning others standing in it. The subjects need not be commingled with others accused or suspected of crime. The total time for assembly and viewing need hardly be more than a few minutes. In short, the process is to be as antiseptic as possible.

We are first confronted with jurisdictional questions relating to the power of the judicial officer, in the first instance to issue such an order, and to our jurisdiction to review it. For reasons to be discussed, we resolve those questions in favor of the contemplated lineup and our review of those orders prior to lineup.

Necessarily then, we conclude that court-ordered lineups predicated on reasonable grounds short of a basis for formal arrest can be squared with the Fourth Amendment—the test being whether the particular intrusion is reasonable when based on all the known facts and legitimate law enforcement interests. Of course, balance of the competing interests must be most careful.

■ In No. 4480 Original (Wise), the United States, on reflection, views the facts as sufficient to warrant formal arrest. We are thus told the course earlier chosen has been abandoned and a request is made to remand the case for dismissal of the lineup order. This we do, but we further conclude that even in cases warranting formal arrest the. United States should be permitted in cases it deems appropriate to request this kind of lineup or other identification procedure[5] from the magistrate as an alternative to formal arrest. In this way the traditional division of functions between the executive and judicial branches can be preserved in this innovative procedure.

In No. 5456 (John Doe) we conclude, for the reasons to be discussed, there is insufficient particularity and specificity of known facts reflected in the material submitted to warrant under Fourth Amendment standards the kind of intrusion contemplated. Because the device of court-ordered lineups, short of grounds for formal arrest, is novel, our disposition will permit the Government to resubmit the matter to the magistrate with a more specific and articulated basis for ordering participation in the lineup.

Our decision then will require treatment of the jurisdictional questions in Part I of this opinion and the constitutional issue as it relates to the facts in the case of John Doe in Part II. The facts respecting No. 4480 Original (Wise) will not be discussed in light of the disposition outlined, and further factual references will be to the "John Doe" case only.

I

A. *The Judicial Power of the Magistrate to Issue the Challenged Process*

■ Assuming the power of this court to determine jurisdiction in the first instance, we treat the question whether the magistrate has power under any circumstances to issue process, short of commanding formal arrest, requiring participation in an otherwise proper lineup.[6] It is clear that by both the Federal Rules of

5. Davis v. Mississippi, 394 U.S. 721, 728, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and Shaykar v. Curran, No. 24,826 (D.C. Cir., filed November 12, 1970, interim unpublished order dated January 25, 1971), relating to a government motion to compel prearrest fingerprinting and furnishing of hair sample. *See* note 22 *infra* and related text.

6. Necessarily included would be the fingerprinting process. *See* Davis v. Mississippi, *supra* note 5.

Criminal Procedure[7] and D.C.Code 1967, § 11–981, judges of the District of Columbia Court of General Sessions may issue warrants for offenses against the United States committed in the District of Columbia. Counsel for petitioners argue that Rule 4(a), Federal Rules of Criminal Procedure, operates to limit such power to issuance of warrants or summonses only when "it appears * * * that there is probable cause to believe that an offense has been committed *and that the defendant has committed it* * * *." (Emphasis supplied.) The import of this argument assumes that the rule imposes a limitation on the grounds for issuance of that and similar process. We do not view the nature and purpose of those rules as limiting that authority. This is neither the purpose of the rules[8] nor the purpose of Congress in providing authority for their adoption.[9] Indeed, an example revealing that the rules do not preclude substantive changes in case law is Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), where, notwithstanding the limitation on the scope of items properly the subject of a search warrant under Rule 41(b), Federal Rules of Criminal Procedure, the Supreme Court appears to contemplate future issuance of a search warrant for previously forbidden items described as "mere evidence."

The United States, on the other hand, argues that authority to issue the challenged summonses and orders derives from inherent power in aid of the authority to issue warrants pursuant to D.C.Code 1967, § 11–981. *Cf.* Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 166, 417 F.2d 728, 734 (1969), dealing with exercise of inherent authority to order limitation on official use of arrest records. It is also argued that this power emanates from the All Writs Act, 28 U.S.C. § 1651(a) (1964). The United States, in addition, relies on United States v. Greene, 139 U.S.App.D.C. 9, 429 F.2d 193, 197 n.7 (1970), and Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968). While those cases relate to the constitutional issue presented here they are of little help on the purely jurisdictional point because in both cases that court appears to assume the existence of judicial power to order lineup participation. No derivation of that power was discussed or even questioned.[10] *Adams,* of course, is an example of the use of that power where grounds for formal arrest are lacking as to other similar offenses.

■ We conclude there are two predicates upon which power to issue the challenged orders may be based. First, judges of the District of Columbia Court of General Sessions like judges of this court have "judicial power * * * to issue *different types of remedies* to effectuate [their] conceded jurisdiction over some subject matter [(here the power of those judges to issue warrants pursuant to D.C.Code 1967,

---

7. Rule 4(a) was applicable to judges of the District of Columbia Court of General Sessions when taking action governed by that rule. *See* Fed.R.Crim.P. 1 & 54 (a) (2) ; Notes of Advisory Comm. on Rules, 18 U.S.C. (Appendix), Rule 54, Note to Subdivision (a) (2), paras. 1 & 3 (1964). *Cf.* In re Gates, D.C.App., 248 A.2d 671, 675 (1968). *Now see* Section 111 of the District of Columbia Court Reform and Criminal Procedure Act of 1970, (§§ 11–923(c) (2) & 11–946), Pub. L.No.91–358, approved July 29, 1970, 84 Stat. 486, 487.

8. Fed.R.Crim.P. 2 provides:
   These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.

9. 18 U.S.C. § 3771 (1964) authorizes adoption of "rules of pleading, practice, and procedure with respect to any or all *proceedings prior to* and including verdict * * *." (Emphasis supplied.)

10. Prior to *en banc* argument in these cases, we, sua sponte, requested supplemental memoranda on this point, our jurisdiction, and other issues not earlier dealt with in the pleadings. (*See* note 12 *infra.*)

§ 11–981, against persons accused of crime committed in the District of Columbia)]." *See* Morrow v. District of Columbia, *supra* 417 F.2d at 732 n.10. That power may also be viewed as emanating from the All Writs Act, 28 U.S.C. § 1651(a) (1964). Morrow v. District of Columbia, *supra* 417 F.2d at 734–735. In either event, it is necessary that a judge of that court act in connection with "subject matter independently within [the court's] jurisdiction" and not in connection with assumed omnificent ancillary jurisdiction concerning a "matter over which, but for a pending matter, it would have no jurisdiction" at all. Morrow v. District of Columbia, *supra* 417 F.2d at 732–733 n.10. If this power is viewed as "All Writs" power under Section 1651 (a), *supra,* the same inquiry, in language of that Act, is whether the process issues "in aid of" jurisdiction to issue arrest warrants. Clearly, the challenged process was an exercise of jurisdiction to determine whether specific statutory power should or should not be utilized.[11] Thus, the summonses and orders conformed to accepted concepts of delegated judicial power and do not reflect usurpation of authority not duly conferred by law. *See also* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1967), revealing examples of court-ordered eavesdropping in aid of judicial power without reference to a specific authorizing statute.[12]

### B. *The Jurisdiction of This Court*

In their supplemental memoranda, the parties take the view that this court has All Writs jurisdiction to entertain a request for and issue a writ in the nature of prohibition. They rely on language in Morrow v. District of Columbia, *supra* at 165, 417 F.2d at 733. We posed the question since the alleged offense is rape and jurisdiction over that felony is vested in the United States District Court for the District of Columbia. *See* note 12 *supra.* We would have no potential jurisdiction as required under the All Writs Act, 28 U.S.C. § 1651 (1964).[13] The Government ob-

11. It is unimportant that, if identified at the lineup, the police may arrest the subject without first obtaining a warrant. *See* D.C.Code 1967, § 4–136 and Carroll v. Parry, 48 App.D.C. 453 (1919). The court had jurisdiction, and indeed a duty, to conduct proceedings under Rule 5, Fed.R.Crim.P., including a determination as to "probable cause to believe that an offense has been committed and that the defendant has committed it"—the same determination which must be made before issuance of an arrest warrant. Of course, the police may seek an arrest warrant after the lineup identification if they deem that to be appropriate.

12. We note, before passing on to the issue of our jurisdiction, a question posed by our earlier order requesting supplemental memoranda. *See* note 10 *supra.* In that order, we prompted the parties to discuss whether the relief sought by the United States was not available through district court process in aid of its grand jury proceedings. Both appear to have misapprehended the customary nature of those proceedings and the power of the grand jury. They take the view that the contemplated lineup would have to take place before a convened grand jury and petitioners protest that such proceedings are secret and counsel for the subject would be excluded. *See* Fed.R.Crim.P. 6 (d), & (e). The Government views the procedure as lawful but impracticable.

We see no reason why, as in all other grand jury inquiries into asserted crime, that body could not have this type of summons and order issued and enforced by the district court. It is not necessary that the lineup take place before the grand jury any more than that body must witness a fingerprint, handwriting, or laboratory analysis. All that is required, if the grand jury wants further evidence on identification, is that the function be performed elsewhere in a lawful manner and that a witness appear before the grand jury to inform it of the results and thus the availability of testimony on the point for trial. *See* United States v. Doe, 405 F.2d 436 (2d Cir. 1968).

Of course, such use of grand jury process would have to be consistent with the Fourth Amendment standards as set forth in Part II of this opinion.

13. Although we and the trial court would have potential jurisdiction if the ultimate prosecutive decision results in a misdemeanor charge.

served at oral argument that D.C.Code 1967, § 11–963, confers jurisdiction on the "Court of General Sessions" to hold preliminary hearings and commit or admit to bail persons charged on complaint with a felony, and that this court has supervisory authority over that court. *Compare,* however, D.C.Code 1967, § 11–981 relating to the power of "each judge" of that court to issue arrest warrants.

■ We now think it is unnecessary for us to resolve that question for in the determination of our jurisdiction it becomes apparent that the orders of the magistrate are final and thus appealable under D.C. Code 1967, § 11–741(a) (1). What is finally decided by the challenged orders is the question whether the subject will be required to stand in a lineup. This view of finality of decision is consistent with that expressed in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 545–547, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). We observe that it makes no difference on the question of finality that the issue of admissibility of any lineup identification may subsequently be litigated. The question of admissibility of evidence in a criminal trial is a separate issue from the one with which we are now concerned. The instant orders are analogous to pretrial bail orders in criminal cases. Such bail orders are final as they relate to pretrial liberty and the Supreme Court has so held in rejecting the use of extraordinary writ to obtain review of such orders. Stack v. Boyle, 342 U.S. 1, 6–7, 72 S.Ct. 1, 96 L.Ed. 3 (1951).

In light of our conclusion, *infra,* that a lineup order prior to formal arrest can be squared with the Fourth Amendment under appropriate circumstances, the right to review by direct appeal of such orders becomes an integral part of the procedure. We view the opportunity for immediate and expedited direct review of such orders as essential to the balancing, on the scale of reasonableness, of the interests of law en-

forcement and the right to individual liberty. In this unique area of executive-judicial law enforcement activity it is necessary to have a means whereby the reasonableness for the proposed intrusion on liberty can be reviewed before the fact. We are prepared to supply this ingredient by an expedited appeal and disposition of such cases. *See* Rule 4(III) of the General Rules of this court effective February 1, 1971. Accordingly, we deny issuance of the requested writs but treat the materials before us as appeals from final orders taken pursuant to D.C.Code 1967, § 11–741(a) (1).

II

*The Contemplated Lineup Is a Reasonable Intrusion on Liberty and Hence is Constitutionally Permitted*

■ Petitioners, relying on a traditional approach taken in most search and seizure cases, take the position that the contemplated lineups amount to an unreasonable deprivation of liberty and would violate the Fourth Amendment. This position is bottomed on the idea that no such intrusion can be lawful unless there is "probable cause". By that term they mean probable cause for formal arrest—that is, probable cause to believe that a crime was committed and that the person suspected probably committed it.[14] Concededly, in that sense we are not here dealing with the usual probable cause arrest case. While the former ingredient is obviously present, the element of "probable" identification sufficient for formal arrest is lacking in this instance. The parties so agree and we so hold.

■ It, therefore, appears appropriate first to inquire whether under the Fourth Amendment it is possible to view a lawful deprivation of personal liberty by governmental action as anything but a formal arrest. Obviously, restrictions by the state on personal liberty occur often without thought to placing formal criminal charges. One

---

14. This is the standard under Fed.R.Crim. P. 4(a) for issuance of an arrest or summons and for holding an arrested person to answer in the district court under Fed.R.Crim.P. 5(c).

may reasonably be stopped and asked questions by the police or requested to furnish identification.[15] Indeed, the Supreme Court has sanctioned momentary on-street detention under the Fourth Amendment even though it does not "eventuate in a trip to the station house and prosecution for crime", Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), and even though traditional probable cause for formal arrest was lacking. Such detention was accurately and legally characterized as a "seizure" of the person within the protective scope of the Fourth Amendment.[16] *Id.* at 16–20, 88 S.Ct. 1868. Surely then, the orders here reviewed are not constitutionally invalid merely because they do not entail a formal arrest based on traditional ingredients of that type of probable cause.

A significant case relevant to this issue was decided last term by the United States Supreme Court, Morales v. New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969). The New York court held that the state possessed authority consistent with the Fourth Amendment to conduct brief custodial interrogation of " 'those persons reasonably suspected of possessing knowledge of the crime under investigation in circumstances involving crimes presenting a high degree of public concern affecting the public safety.' " *Id.* at 104, 90 S.Ct. at 293 *citing* from People v. Morales, 22 N.Y.2d 55, 65, 290 N.Y.S.2d 898, 907, 238 N.E.2d 307, 314 (1968). The Supreme Court, faced with an argument that the detention was forbidden when it was 'for custodial questioning *on less than probable cause* for a traditional arrest * * *", Morales v. New York, *supra* at 104, 90 S.Ct. at 293 (emphasis supplied), chose not to decide the

question absent a record necessarily presenting the issue for decision. The Court in recognizing that this question went beyond the holding in Terry v. Ohio, *supra*, remanded for an evidentiary hearing. In so doing it is worthy of note that the Court suggested three circumstances in which the interrogation might be considered proper— (1) "that there was probable cause for an arrest"; (2) "that Morales' confrontation with the police was voluntarily undertaken by him"; and, most significant for the instant case, (3) "that the confessions were not the product of illegal detention." 396 U.S. at 105, 90 S.Ct. at 293. At the very least this would seem to suggest that there is some room under the Fourth Amendment for legal detention on facts short of probable cause for a "traditional arrest". *See also* Davis v. Mississippi, 394 U.S. 721, 728, 89 S.Ct. 1394 (1969).

We recognize, however, that what is contemplated here is a seizure of the person. To be sure it is a more severe seizure than the momentary one of *Terry*, but obviously of lesser magnitude than a formal arrest.

Counsel for petitioners view the severity of such lineup detention as including the risk of possible misidentification and subsequent criminal charges. While it may be realistic to do so, those possibilities do not elevate such a proposed lineup detention to the level of formal arrest. Moreover, properly conducted identification procedures have been viewed by the Supreme Court as reducing the possibility of misidentification to an accepted level such that the question is appropriately one for the fact-finder at trial. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967 (1967). *See also*

15. United States v. Lee, D.C.App., 271 A.2d 566 (1970).

16. It is recognized that the *Terry* decision expressly left undecided the propriety of "investigative 'seizure[s]' upon less than probable cause for purposes of 'detention' and/or interrogation." Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 (1968). We are not here concerned with

such a seizure for detention or interrogative purposes. Handled properly under United States v. Wade, *supra* note 2, and Stovall v. Denno, *supra* note 2, the purpose of lineup detention expressly has been held proper. *See also* Davis v. Mississippi, *supra* note 5, 394 U.S. at 729, 89 S.Ct. 1394 and Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968).

note 16 *supra.* Indeed, it is possible that under proper circumstances a lineup may not even be a "critical stage" of the accusatory process requiring presence of counsel. United States v. Wade, *supra* 388 U.S. at 239, 87 S.Ct. 1926.

Of course, as reflected in Terry v. Ohio, *supra,* we are bound to test this intrusion against established Fourth Amendment standards. In so doing, it is necessary to apply the constitutional mandate of reasonableness. Camara v. Municipal Court, 387 U.S. 523, 535, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

"In order to assess the reasonableness of [the contemplated seizure] as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to [seize] against the invasion which the [seizure] entails.'" Terry v. Ohio, *supra,* 392 U.S. at 20–21, 88 S.Ct. at 1879 *quoting* from Camara v. Municipal Court, *supra* 387 U.S. at 534–535, 536–537, 87 S.Ct. 1727. Recognizing the seriousness of the intrusion, we take note of the governmental interest on the other end of the scales.

The police are confronted with a woman who reports that she was forced into an alley in a high-crime area and raped at knife point at about 10:40 p. m. Surely, there exists a compelling interest for the state to apprehend the offender—not only to punish him but also to improve a desperate situation regarding urban safety and lawlessness. To this extent the Government has not only a right, but indeed a duty, to employ every reasonable law enforcement device to maintain the integrity of the state in its role of insuring an ordered and peaceful community. *Cf.* Terry v.

Ohio, *supra,* 392 U.S. at 23–24, 88 S.Ct. 1868, recognizing safety of the police as a factor in that decision. In a similar context, this governmental interest was recognized in Adams v. United States, *supra,* and in United States v. Greene, *supra.*

In connection with these observations, it is well to recognize and discuss the alternatives left to the police if they are denied the help of the neutral and detached judicial branch in this type of case. Certainly, the police should not be forced into making an unlawful formal arrest. Any evidence obtained incident thereto would be suppressed. This includes some identification evidence, *e. g.,* Davis v. Mississippi, *supra;* and Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958), both relating to fingerprints. *Cf.* United States v. Greely, 138 U.S.App.D.C. 161, 425 F.2d 592 (1970), relating to a trial court ruling suppressing identification testimony based on an illegal arrest.

If the police are to know whether the right man has been singled out, or whether they must continue to look for him, they will be forced to arrange some other confrontation. Such possibilities come to mind as arranging for the woman to go to the subject's home, place of employment, or other location that he frequents. In addition, it will not do for the police to arrange a confrontation by requesting the subject to appear for some informal "hearing" in the United States Attorney's office,[17] or the police station.[18] Nor could a courtroom confrontation be utilized.[19] Aside from the obvious suggestibility inherent in such procedures, it is apparent that the subject and his counsel are deprived of meaningful cross-examination as to the verity of any courtroom identification.[20]

What, thus, becomes obvious is that the administration of criminal justice can and ought to devise a procedure which reason-

17. United States v. Greene, 139 U.S.App. D.C. 9, 429 F.2d 193 (1970).

18. Williams v. United States, 133 U.S.App. D.C. 185, 409 F.2d 471 (1969); Cunningham v. United States, 133 U.S.App. D.C. 133, 409 F.2d 168 (1969).

19. Mason v. United States, 134 U.S.App. D.C. 280, 414 F.2d 1176 (1969); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968).

20. United States v. Wade, 388 U.S. 218, 236, 87 S.Ct. 1926 (1967).

**214**

ably makes persons "available for line-up identification in respect of other crimes for which there is less than probable cause to [make a formal] arrest." Adams v. United States, 130 U.S.App.D.C. 203, 208, 399 F.2d 574, 579 (1968).[21] Indeed, in its interim order in Shaykar v. Curran, No. 24,826 (D. C.Cir., filed November 12, 1970; interim unpublished order dated January 25, 1971), relating to a government motion to compel

prearrest fingerprinting and furnishing of hair sample, a division of that court composed of Chief Judge Bazelon and Circuit Judges Leventhal and MacKinnon recently recognized "the need of the Government for expedition and efficiency in its criminal investigation processes" as it relates to identification procedures short of formal arrest. Though in its order dated January 25, 1971, set forth in the margin,[22] that

---

21. It is significant that in this part of the decision in the *Adams* case the United States Court of Appeals for the District of Columbia Circuit obviously also had in mind a defendant who was released by the magistrate under the Bail Reform Act of 1966, 18 U.S.C. § 3146 et seq. In the case of a bailed defendant, as in this case, the contemplated court-ordered lineup entails brief detention of the person then at liberty. Although the opinion of the court did not discuss the constitutionality of such limited detention absent grounds for formal arrest, it is certain that the court contemplated persons at liberty being ordered into a lineup on less grounds for formal arrest. It would seem that if constitutional doubts regarding such recommended procedure existed the suggestion would not have been made. *See also* United States v. Greene, 139 U.S.App. D.C. 9, 429 F.2d 193, 197 (1970), embodying a similar recommendation.

22. No. 24,826       January 25, 1971
    Cleo Kyin-oo Shaykar, Petitioner
                    v.
    Honorable Edward M. Curran, Respondent
    Before: Bazelon, Chief Judge; Leventhal and MacKinnon, Circuit Judges, in Chambers.

### ORDER

This cause came on for consideration on petitioner's petition for a writ of prohibition and for immediate consideration thereof and was argued by counsel.

Petitioner raises important and difficult questions of interpretation and application of the Fourth Amendment. See Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). In order to balance the need of this Court for more time to consider these novel questions fully with the need of the Government for expedition and efficiency in its criminal investigation processes, it is

ORDERED by the Court that the stay of the District Court's order is continued in effect, pending further order

of this Court, subject to the following conditions:

First, Miss Shaykar shall report to the district court for the taking of fingerprints, palm-prints, and hair samples within 10 days from the entry of this order. The strictures on length and conditions of the detention designed by the district court must be rigorously observed; particularly, petitioner is to be detained no longer than four hours, and is not obligated to submit to any interrogation or to make any statement. Petitioner may be accompanied by her lawyer during this session; an Assistant U. S. Attorney may also be present. If petitioner's counsel so requests, a Court Reporter shall be present at the session; he shall record all statements regarding the proceeding, including any objections by counsel to procedures used.

Second, the Government may subject the evidence so taken, as well as similar evidence already in its possession, to any scientific tests it considers essential to the investigative effort. The Government shall make adequate provision for petitioner, her counsel and experts (a) to be advised in advance of the nature of the tests proposed by the Government; (b) to have opportunity in advance to make comments and suggestions to the Government testers for alternative or additional procedures. This shall take place in the form of a conference in which the experts can meaningfully exchange information and views, a conference that may be attended by counsel and by an Assistant U. S. Attorney; the conference shall if either counsel so requests be preserved for later judicial consideration by either reporter's notes or tape recording. If petitioner so requests and this is not unfeasible, her experts shall be present at the tests.

Third, the protection afforded to Petitioner by the order of the district court regarding return of an inventory of evidence taken within 45 days of its taking, and destruction of that evidence if probable cause to arrest is not found by the

court does not view it as precedent, it is obvious that the court recognizes both the need to fashion such procedures and the need to acknowledge constitutional room for them. Surely, Miss Shaykar would not be forced by that order to submit to such limited interference with liberty unless that court deemed the basis therefor to be reasonable and therefore constitutional. If under that court's order Miss Shaykar is not identified, the necessity to decide the issue will have been, by the terms of the order, evaded. It is inescapable, however, that the court, though wishing not to be viewed as doing so, has in reality resolved the constitutionality of the invasion on liberty there directed. It cannot and should not be otherwise. A court or magistrate does not issue a warrant and the police thereafter execute it—all with the understanding that the same issuing authority may later declare what was earlier authorized to be unreasonable and unconstitutional. This is why we decide the constitutional issue rather than "avoid" it as the main dissent would have us do. Clearly, present resolution of that issue "is essential to a proper disposition of [the] case".

Fickling, J., *dissenting,* note 11 *infra. See* D.C.Code 1967, § 17–306. This is particularly true where the question is novel and the public need so great. This would, in reality, seem to be the view of the present six members of the circuit court who participated in the *Shaykar* order; United States v. Greene, *supra;* and Adams v. United States, *supra,* as well as Circuit Judge (now Chief Justice) Burger in his concurring opinion in *Adams,* where he expressed concern for "arbitrary interference with liberty." *Id.* 130 U.S.App.D.C. at 210, 399 F.2d at 581.

The issue is hardly an "abstract" one, as Judge Gallagher views it, when it is necessary for us to decide between a cryptic holding that the facts presented are not enough to warrant the intrusion or whether no set of facts short of formal probable cause can pass constitutional muster. To simply hold the present facts insufficient implicitly says that some set of facts would be sufficient for the proposed lineup.

On balance, and realistically viewing the impact of a court-ordered lineup of the

---

time of such return, is continued in effect.

Fourth. any evidence growing out of these samples and tests may be included in the evidence submitted to a magistrate for a determination that there is probable cause (a) to issue a warrant for petitioner's arrest, and/or (b) to hold petitioner to answer, see Rule 5 Federal Rules of Criminal Procedure. This condition in no way binds this Court to a finding that such evidence may constitutionally be used for either purpose. Petitioner may apply to this Court for relief from wrongful arrest and detention; at such time, this Court will consider whether the evidence obtained by Petitioner's compliance with this Order can lawfully be used to sustain petitioner's arrest and detention.

Fifth, neither the actual samples obtained pursuant to this Order, nor evidence from tests performed thereon, shall be submitted to a grand jury for any purpose pending further order of the court. The Government may apply to this Court for relief from this condition; at such time, the Court will consider

whether the evidence may properly be submitted. See Smith v. Katzenbach, 122 U.S.App.D.C. 113, 119, 351 F.2d 810, 816.

Since Petitioner's interest extends to the use as well as the taking of her prints and hair samples; the questions raised by the Petition for Writ of Prohibition remain alive for determination by this Court. If the evidence taken is destroyed, counsel for the Government will promptly file in this court a suggestion of mootness. Meanwhile counsel for both Petitioner and the Government shall undertake to be ready to file briefs promptly in the event the case is not thus mooted and either petitioner or the Government make application to this court to modify or vacate this order. This order is not to be taken as a precedent; it is intended as a means of presenting the issues in this case to the Court.

Chief Judge Bazelon concurs in the foregoing order, but would provide as part of the second condition of the stay that at the request of Petitioner, her experts, lawyer and a court reporter shall be present at the testing session.

*Per Curiam*

kind here contemplated on liberty,[23] we conclude, under the test expressed in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727 (1967), that the public interest can validly require this intrusion.

Under proper circumstances, and against a backdrop of required specificity,[24] such a device as court-ordered lineups can prove to be reasonably related to governmental and private rights, and thus a constitutional balance regarding both.[25] Grave reservations exist, however, as to whether this type of court-ordered lineup, not connected with a formal arrest, may be used constitutionally in other than serious felonies involving grave personal injuries or threats of the same. The governmental interest, though serious, is not of the same magnitude in commercial crimes involving property or money such as forgery or false pretenses or other less serious offenses. While the "sounder course" is to view all intrusions "in light of all exigencies of the case", Terry v. Ohio, 392 U.S. 1, 17 n. 15, 88 S. Ct. 1868, 1878 (1968), it would seem that some offenses, not involving serious personal injury or danger, weigh less as a part in the "central element in the analysis of reasonableness." *Id.* In such cases it is highly likely that the governmental interests in law enforcement cannot outweigh the right of liberty, or freedom from being ordered into even the most antiseptic lineup, under circumstances short of traditional probable cause for formal arrest. Of course, each case must be considered on its own facts.

We are not unmindful that the Supreme Court in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), while suggesting and thus appearing to sanction a similar procedure to secure fingerprints of unarrestable suspects, observed that such procedure is a more scientific method of identification than eyewitness identification. *Id.* at 727–728, 89 S.Ct. 1394. In our judgment, that opinion tends to support our conclusion that court-ordered identification procedure for unarrestable suspects can be constitutional; certainly it does not indicate any intended prohibition against the identification procedure to be used in this case. Indeed, eyewitness identification, though less scientific, is not always less accurate.[26] Moreover, the Supreme Court appeared to have been more concerned with unfair, suggestive and thus the least accurate eyewitness identification when it discussed the difference between the human and the scientific method. Indeed, it is significant that the Court referred to this difference in the context of avoiding forbidden interrogation, searches, harassment, and "improper line-up and the 'third degree.'" *Id.* at 727, 89 S.Ct. at 1398. None of these prohibited events are contemplated or will be permitted under the proposed procedure. We, therefore, do not believe that Davis v. Mississippi, *supra*, can be read as casting constitutional doubt on this type of court-ordered lineup where Fifth and Sixth Amendment rights are to be fully protected.

We turn then to the question whether on the facts as presented the requisite spec-

---

23. Those interests are well discussed in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), and Camara v. Municipal Court. 387 U.S. 523, 87 S.Ct. 1727 (1967).

24. " * * * And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880.

25. The desirability and reasonableness of such lineups involving already arrested suspects is a well established fact. Such an innovative interlacing of executive and judicial functions was begun as a result of the suggestion in Adams v. United States, 130 U.S.App.D.C. 203, 207–208, 399 F.2d 574, 578–579 (1968). So-called "Adams" lineups have proved a useful tool in improving the effectiveness of law enforcement both as to convicting the guilty and release of the innocent. *See also* United States v. Stevenson, U. S.App.D.C. (No. 23,922, decided December 3, 1970).

26. The "unforgettable face" in eyewitness identification is well recognized. Russell v. United States, 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284 (1969).

ificity as to articulable facts was present in order to permit meaningful evaluation of the reasonableness of the proposed lineup by the neutral and detached judicial officer. Terry v. Ohio, *supra* 392 U.S. at 21–22 nn. 19 & 20, 88 S.Ct. 1868 and related text. That, of course, is the constitutional touchstone of such an order.

The record reveals a complaint of rape at knife point and a statement by the victim that one subject's photograph among pictures of "possible suspects" reveals "facial features * * * similar to those of the man who assaulted her. * * * *" The victim also said that to be positive she would have to see the suspect in person.

We are not unmindful that often this is all the police are told by a complainant [27] and we do not wish to imply that more specific or dogmatic identification from the victim is expected or constitutionally required. Surely, the police should not be encouraged to demand more positive identification than the victim is honestly able to furnish. But such tentative and hesitant identification must be taken in complete context to know whether a lineup may reasonably be required.

For instance, the magistrate was not informed as to the victim's opportunity to observe the subject before and during the rape. More significantly, all that is revealed is that the subject's photograph was selected from a group of pictures of possible suspects. The judicial officer was, thus, unable to evaluate the understandably tentative and hesitating photographic identification against facts known by the police as to why they concluded these photographs were of possible suspects.

■ Under the limited facts presented the proposed lineup "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than [possible] inarticulate hunches * *."

Terry v. Ohio, *supra,* 392 U.S. at 22, 88 S. Ct. at 1880, and cases there relied upon. We think it is necessary for the police to specify how they arrived at their conclusion that the individuals in the group of photographs were possible suspects. It may be that they were previous sex offenders with similar *modus operandi,* or that they had opportunity to commit the offense because of residence, employment, or known presence generally in the vicinity of the offense. It may be that those persons were previous acquaintances of the victim. In some cases, possible suspects may be singled out because of similar characteristics of description. These or a combination of these and other factors may have led the police to their conclusions regarding this group of suspects. There is every reason, with the exception of a case involving a reliable confidential informant, for the police to disclose all factors they possess shedding light on the likelihood that the tentative identification is the correct one. As to the missing elements, the judicial officer simply agreed with and gave judicial sanction to the conclusion of the police that the selection of this subject was deductively accurate enough to warrant ordering the lineup. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964).

With a sufficiently detailed recitation of articulable facts the judicial officer will be able to perform his all-important function of evaluating the reasonableness of the proposed intrusion against its impact, though limited to the extent possible, on personal liberty. In this way, the vice of old general warrants and writs of assistance [28] is avoided and we remain faithful

---

27. *E. g.,* United States v. Greene, 139 U.S. App.D.C. 9, 429 F.2d 193 (1970).

28. Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Douglas, J., dissenting); Henry v. United States, 361 U.S. 98, 100–101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

to our fundamental commitment against use of dragnet technique.

Accordingly, we reverse the ordered lineup in case No. 5456 (John Doe) without prejudice to the Government's promptly submitting more specific information as required in this opinion. In case No. 4480 Original (Wise) we remand, per the government's request, to permit dismissal of the order for the lineup unless the Government should conclude to use the lineup before accomplishing formal arrest.

So ordered.

FICKLING, Associate Judge (dissenting):

The victim of a rape gave the police a statement describing the circumstances surrounding the assault. Four months later the victim was shown a number of photographs of possible suspects, one of whom she thought might be her assailant.

The police submitted an affidavit asserting the above facts to a judge of the District of Columbia Court of General Sessions (now the Superior Court) and requested an order which would direct the petitioner to appear in a lineup. At the hearing below, it was conceded by the Government and was found by the judge that no probable cause existed for the arrest of the petitioner. However, the judge, looking solely at the police affidavit containing the victim's statement that "the facial features of the photograph were similar to those of the man who assaulted her, but to be sure she would have to see him in person to make a positive identification," found that there were reasonable grounds to suspect petitioner.

The request for the lineup order was granted conditioned upon the so-called "antiseptic" procedure outlined in the majority's opinion.

The petitioner moved in this court for a writ of prohibition.

I would grant the writ and, therefore, respectfully dissent from the holding that a judge of the District of Columbia Court of General Sessions [1] has the authority to order a suspect in a rape case to appear in a lineup where, concededly, no probable cause exists for the issuance of an arrest warrant against him. The majority states that the authority emanates from two separate though closely related sources: (1) the All Writs Statute, 28 U.S.C. § 1651,[2] and (2) the court's inherent power.[3] I cannot accept either of these grounds as authority for the contemplated order and I will give my reasons in Part I. In Part II I will give my reasons for thinking the order is unconstitutional.

## PART I

In Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 417 F.2d 728 (1969), the Circuit Court of Appeals stated that "Section 1651 literally encompass[es] the D.C. Court of Appeals, a court 'established by Act of Congress.'" Unquestionably, this same reasoning applies in the case of the General Sessions Court, which was also created by an Act of Congress.

1. Now the Superior Court of the District of Columbia.

2. 28 U.S.C. § 1651. Writs.
    (a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

3. The eavesdropping cases, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), are cited by the majority as examples of exercise of judicial power without reference to a specific authorizing statute. However, I would point out that strict requirements for probable cause were insisted upon and, though the authority for the court orders was not specifically discussed, I assume and expect the Supreme Court also assumed that Fed.R.Crim.P. 41 was sufficient authority since searches were involved.

Recognizing that "All Writs" power resides in the General Sessions Court, I now reach the question of whether it can properly be exercised for the purpose of issuing this innovative lineup order. There are two built-in statutory restrictions upon the exercise of this power: (1) it can be used only in aid of a court's respective jurisdiction, and (2) the purpose for its exercise must be agreeable to the usages and principles of law.

The effect of the first restriction is to prevent courts from using this statutory power to expand their jurisdiction. As Professor Moore has stated

> * * * it is settled that § 1651 does not enlarge a court's jurisdiction, as established by the Constitution or by statute; the purpose of § 1651 is to effectuate the established jurisdiction.[4]

Since D.C.Code 1967, § 11–981 [5] gives the General Sessions Court jurisdiction over arrest warrants generally, the majority appears to conclude that personal jurisdiction over the suspect is not required, nor is jurisdiction over a specific subject matter or, if it is, then potential jurisdiction—*i. e.,* that at some point in the future it *might* be possible to legally

arrest—is sufficient. I would hasten to point out that everyone of us is within this potential jurisdiction.

An examination of Section 11–981 will demonstrate that it confers no jurisdiction in a case such as this and therefore an exercise of Section 1651 power cannot be justified as "in aid of" Section 11–981. Under Section 11–981 a General Sessions judge can issue warrants but only *"against persons accused of crimes and offenses."* Until someone is accused, the judge has no jurisdiction whatsoever to issue a warrant under Section 11–981. Here, admittedly, we have only suspicion; no one has been officially accused of a crime. It may well be that an investigating officer has privately made an accusation to one or more of his colleagues. It is reasonable to assume, however, that Congress meant something more substantial when it used the term "accused." I believe that, for the purposes of Section 11–981, no one is accused of a crime until a complaint or an affidavit which shows probable cause in compliance with GS Crim.Rule 4(a) [6] is filed against a particular person, or when an indictment is filed. It is my opinion that Rule 4's provision for summonses is the only potential source of power for this lineup

---

4. 6 J. Moore, Federal Practice ¶ 54,10 [2], at 64 (2d ed. 1966).

5. Section 11–981. Power of judges to issue warrants returnable to Criminal Division; record.

   Each judge of the District of Columbia Court of General Sessions may, at any time, including Sundays and legal holidays, on complaint under oath or actual view, issue warrants returnable to the criminal division of the court against persons accused of crimes and offenses committed in the District of Columbia. In every such case, he shall make a record of his proceedings in a book to be kept for that purpose. The warrants shall be issued free of charge.

   After February 1, 1971, judges of the Superior Court have the power to issue specific types of warrants under the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91–358, § 111 (§ 11–941). This

power is "[s]ubject to title 23" and specifically § 23–561.

6. Rule 4. Warrant or Summons Upon Complaint
   (a) Issuance.
   If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. Upon the request of the attorney for the government a summons instead of a warrant shall issue. More than one warrant or summons may issue on the same complaint. If a defendant fails to appear in response to the summons, a warrant shall issue, unless the attorney for the government requests the issuance of another summons.

order. The rule's requirement for probable cause is a clear prohibition against the use of a lesser standard.

The majority states that

* * * the [challenged] process issues "in aid of" jurisdiction to issue arrest warrants. Clearly, the challenged process was an exercise of jurisdiction to determine whether specific statutory power should or should not be utilized.

This is an erroneous statement for it seems clear to me that the challenged process was an exercise to attempt to establish probable cause which might then give the judge jurisdiction to issue an arrest warrant. It is hard to imagine a more blatant attempt to extend the jurisdiction of the court, a practice which is explicitly condemned by Section 1651.

Earlier, I pointed out a second restriction on the exercise of the All Writs power: the purpose for its exercise must be agreeable to the usages and principles of law. Since I believe, for reasons stated in Part II of this dissent, that the order violates the Fourth Amendment, this restriction also prevents reliance on Section 1651.

The majority also relies on the inherent power of a court as an alternative basis to support the issuance of the lineup order. It recognizes, however, that, essentially this basis must stand or fall on the same reasoning as the All Writs Statute.

In Morrow v. District of Columbia, *supra,* the Circuit Court of Appeals recognized the inherent "power of a court to issue different types of remedies to effectuate its conceded jurisdiction over some subject matter" and posited this court's power to issue extraordinary writs, in appropriate cases, thereon.[7] I do not dispute this proposition, nor do I deny the existence of a trial court's inherent power.

Yet, as the majority recognizes, this power is limited. "The inherent powers of a court do not increase its jurisdiction; they are limited to such powers as are essential to the existence of the court and necessary to the orderly and efficient exercise of its jurisdiction." 20 Am.Jur.2d Courts § 78 at 440 (1965).[8] As I stated earlier, this lineup order is an attempt to extend jurisdiction and therefore cannot be based on any inherent power.

Perhaps the greatest fault in the majority's reasoning on this aspect of the case is the belief that the phrase in *Morrow,* "conceded jurisdiction over some subject matter," is satisfied by the fact that in some situations a General Sessions Court judge has jurisdiction to issue an arrest warrant. The employment of such a broad concept of subject matter jurisdiction, while completely ignoring personal jurisdiction, is totally unjustified. Such a vast extension of the judicial power is frightening. In the sense used here, judges have jurisdiction over an innumerable list of subjects. Can a domestic relations judge, who has jurisdiction over divorce actions, order a married man, suspected by his wife of adultery, to file a sworn admission or denial of such conduct, even though no divorce action or related case has been filed? Since the judge has "conceded jurisdiction" over divorce cases, might we say he has inherent power to do this or, alternatively, that it is "in aid of" his jurisdiction since it might simplify a future divorce action if one is brought? Is such an order so different from saying that a judge can order a rape suspect to stand in a lineup since in the future this might enable him to issue an arrest warrant if one is asked for? In my opinion, inherent powers cannot come into play here until there is some specific subject matter actually before the trial court, independent of any alleged inherent power.

7. The court also discussed ancillary jurisdiction. For the distinction, *see* Morrow v. District of Columbia, *supra,* 135 U.S. App.D.C. at 164 n. 10, 417 F.2d at 732 n. 10.

8. Inherent powers are also discussed at 1 J. Moore, *supra* note 4, ¶ 0.60 [6].

Bestowing power on judges [9] to issue this type of lineup order, despite its "antiseptic" nature, can have grave consequences such as the return of the condemned investigatory arrest. Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963). Unlike the practices in some foreign countries and under other forms of government, generally courts in the United States are not investigatory agencies. Rather, the judicial function calls for neutrality and detachment.[10] Normally, our courts do not lend their authority to an investigation until probable cause has been established. Rather than aid its establishment, the court's function is to judge whether that standard has been met. Police, aided by grand juries and prosecutors, serve as the investigatory arm of the government. If we wish to alter this relationship—assuming for the moment that we constitutionally can—by calling upon the courts to aid a police investigation by helping to establish probable cause, then the legislature should initiate this change.

## PART II

Finding that the instant "lineup order" exceeded the scope of legitimate judicial power, I would normally be disposed to merely state that the writ of prohibition should issue; there would be no need to reach the constitutional question. Courts should refrain from deciding constitutional issues when not necessary for the disposition of the case.[11]

This principle points up an additional problem I have with the majority's opinion. Despite the fact that it finds these orders improper, great effort is expended justifying the issuance of this type of order in a future case. Clearly, even under the majority's view of the case, the constitutional issue need not be reached,[12] nor should be reached.[13]

Since I am writing in dissent, however, I am not so restricted. Not only do I feel free to question the constitutional underpinnings of this ruling but, rather, I am compelled to do so.

The majority holds that forcing a citizen to come to a police station against his will and, further, compelling him to stand on display in an "antiseptic" lineup under threat of imprisonment for contempt of court is not an arrest. Rather, it states this is merely a "lesser intrusion upon liberty" and can be supported by an "articulable suspicion"; since it is not an arrest, probable cause to arrest need not be shown. After employing a balancing test, the majority holds that, in some cases,

9. I presume that the majority does not pretend that mere magistrates have such power. There has been no discussion of the inherent power of a magistrate, nor any assertion that Section 1651 extends to magistrates.

10. *See* Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

11. Even the Supreme Court has a duty to avoid decision on presented constitutional questions "unless essential to proper disposition of a case." Harmon v. Brucker, 355 U.S. 579, 581, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958). Surely we have a duty to show even greater restraint and to observe the fundamental judicial doctrine that unnecessary constitutional questions should be avoided. Sohm v. Fowler, 124 U.S.App.D.C. 382, 385, 365 F.2d 915, 918 (1966).

"[N]o matter how much [the parties] may favor the settlement of an important question of constitutional law, broad considerations of the appropriate exercise of judicial power prevent such determinations unless actually compelled by the litigation before the Court." Barr v. Matteo, 355 U.S. 171, 172, 78 S.Ct. 204, 205, 2 L.Ed.2d 179 (1957); United States v. CIO, 335 U.S. 106, 110, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); Reed v. Franke, 297 F.2d 17, 27 (4th Cir. 1961).

12. In this case the court reversed the ordered lineup because of an inadequate record. Hence, the constitutionality of such a lineup order is not an issue "essential to proper disposition of [the] case."

13. When faced with a similar issue as that before us, the Supreme Court in Morales v. New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), refused to decide the serious constitutional question in the absence of a complete and proper record.

such an intrusion upon liberty can coexist with the Fourth Amendment.[14]

The Fourth Amendment is made up of two clauses: the reasonableness and the Warrant clauses. It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[15]

In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court allowed a limited search for weapons, which admittedly involved a seizure, despite the fact that probable cause, in the traditional sense, was absent. The Court pointed out that it was dealing with swift, on-the-spot police action

> * * * which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. [Id. at 20, 88 S.Ct. at 1879.]

The Court seemed to indicate that the Warrant clause did not apply and therefore the existence of probable cause was not in-

volved,[16] however, here a form of warrant is contemplated and, consequently, the Warrant clause must be considered.

. The overriding standard of the Fourth Amendment is reasonableness;[17] when applicable, however, the effect of the Warrant clause is that seizures upon less than probable cause are unreasonable per se. *No further inquiry into reasonableness is necessary.* The *Terry* decision coupled with dicta from Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), has left the effect of the Fourth Amendment requirement for probable cause unclear. Several alternative conclusions may be drawn.[18]

One possible conclusion is that in all cases probable cause must be shown. However, it is a completely flexible standard varying with all the circumstances of a case. This concept, variable probable cause, stems from the dissenting opinion of Justice Jackson in Brinegar v. United States, 338 U.S. 160, 183, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Unlike our present concept where we focus on only one issue— is there probable cause *to believe* the person is guilty of a crime— [19] this test would call for the examination of a variety of factors such as: the gravity of the crime; whether the police are concerned mainly with detention rather than prevention; the seriousness of the intrusion necessitated by the type of detention em-

---

14. Whether one agrees that this is an arrest, there can be no question but that there is a seizure of the person which is governed by the Fourth Amendment.

15. U.S.Const. amend. IV.

16. The Court stated:
    If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether "probable cause" existed to justify the search and seizure which took place. However, that is not the case. [392 U.S. at 20, 88 S.Ct. 1868, at 1879.]

17. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); Terry v. Ohio, *supra* at 9, 88 S.Ct. 1868; Elkins v. United States, 364 U.S. 206, 222 (1960); United States v. Guadalupe-Gar-

za, 421 F.2d 876 (9th Cir. 1970) (border search).

18. I refer to these because they are interpretations which would come closest to supporting the majority's result. I am not saying that these are the only interpretations possible. .*Terry* was not meant to be definitive. As one commentator has put it
    this was the Court's first foray into this particular thicket and it is thus understandable that it made a conscious effort to leave sufficient room for later movement in almost any direction.
    LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L.Rev. 40, 46 (1968) (hereinafter cited as LaFave).

19. Brinegar v. United States, *supra;* GS Crim.Rule 4. *See also* GS Crim.Rule 41.

ployed. For instance, where a crime as serious as murder is involved and the police are only seeking a 10-minute detention for the purpose of taking fingerprints, a magistrate might be justified in issuing a warrant though the quantum of evidence was sufficient to show only probable cause *to suspect,* rather than probable cause to believe, guilt. Moreover, if the victim happened to be a police officer shot down in the course of duty, this same quantum of evidence might justify more lengthy detention or even the issuance of a search warrant. In essence, probable cause becomes one of a number of factors balanced in a test to determine the overriding standard of reasonableness. Search, frisk, arrest, or detention—variable probable cause applies to all.

I believe it is far too late in the day to argue that this theory applies to arrests or full criminal searches. Such a result would call for a reversal of our jurisprudence surrounding this area of the law. Courts have developed the standard of probable cause to believe and, until it is met, *any arrest* is legally unreasonable. If the type of detention employed, however, does not involve an arrest or a full criminal search, we are faced with a different question.

There is another possible conclusion, in the wake of *Terry,* in regard to the status of probable cause. With this alternative the existing standard calling for probable cause to believe is observed where an arrest or full criminal search is involved; when that standard is not met, the conduct is unreasonable per se. However, the existence of a detention involv-

ing something less than an arrest is recognized. Since a "seizure" is involved, the Fourth Amendment applies,[20] however, the reasonableness standard and the Warrant clause's requirement for probable cause may be satisfied and the seizure sanctioned, despite a failure to meet the traditional probable cause to believe test. It is only when these lesser detentions are involved that variable probable cause comes into play and suspicion becomes legitimate.

It appears that the majority adopts this latter alternative.[21] Under this test the crucial question is whether there is an arrest.[22] If there is, then we must look for traditional probable cause.

The majority holds that the intrusion upon liberty brought about by the proposed lineup order is less than a formal arrest. As intrusions which are considered less than arrests, it refers to *Terry* situations and also states that "[o]ne may reasonably be stopped and asked questions by the police or requested to furnish identification," citing United States v. Lee, D.C. App., 271 A.2d 566 (1970). If by "stop" the majority means to forcefully detain for any purpose other than a search for weapons, we are then in an area specifically left unanswered by *Terry.*[23] The *Lee* case involved a *voluntary* stop upon being asked for identification and the opinion plainly leaves *Terry's* unanswered question open. *See* United States v. Lee, *supra* at 567.[24]

When discussing police power to forcefully detain citizens on the street for investigation, we are in a controversial

20. 392 U.S. at 16, 88 S.Ct. 1868.

21. The majority states that a "formal arrest" is not involved and therefore traditional probable cause is not necessary.
    Since it is apparent to me that the contemplated lineup order cannot be justified even under the standards of this test, I need not here indicate my approval or disapproval.

22. The majority uses the term "formal" arrest. I am not exactly sure what is meant by this. Surely it could not mean to set up a distinction based upon wheth-

er the police choose to bring someone to a station for formal booking. Observance of these formal procedures generally has nothing to do with the time of an arrest.

23. 392 U.S. at 19 n. 16, 88 S.Ct. at 1879.
    We thus decide nothing today concerning the constitutional propriety of an investigative "seizure" upon less than probable cause for purposes of "detention" and/or interrogation.

24. Anything in *Lee* that indicates that the police have a right to detain for investigation is pure dicta.

and largely unchartered area.[25] There can be no doubt but that the police have the right to ask someone to stop and answer questions despite a lack of probable cause. Remington, The Law Relating to "On the Street" Detention, Questioning and Frisking of Suspected Persons and Police Arrest Privileges in General, 51 J. of Crim.L.C. & P.S. 386 (1960). This is not an arrest. Bailey v. United States, *supra*, 128 U.S. App.D.C. at 364, 389 F.2d at 315. Where the police are acting on intuitive suspicion or a mere hunch, however, it is established that they have no power in the face of a citizen's refusal to halt or answer their questions. Green v. United States, 104 U.S.App.D.C. 23, 24, 259 F.2d 180, 181 (1958).

Whether one accepts the validity of a brief on-the-street detention for interrogation,[26] it is clear that it can only be upheld if it can be distinguished from an arrest for, if there is an arrest, then traditional probable cause is necessary. When it is realized that in Kelley v. United States, 111 U.S.App.D.C. 396, 298 F.2d 310 (1961), the court found an arrest when a suspect was ordered to leave a restaurant to answer a few questions, it should be clear

that there is very little room to maneuver short of arrest. In the instant case it is conceded that we have a detention in fact. There can be no doubt but that the police, the suspect, and any reasonable man innocent of a crime would consider this a detention. Whether they would consider it an arrest depends on their definition of that term. Terry v. Ohio, *supra* 392 U.S. at 26, 88 S.Ct. 1868, indicates that not every detention is an arrest. Despite the fact that detention and arrest may not be synonymous, to assert that the detention contemplated by the lineup order is not an arrest is to participate in semantic nonsense. It would appear that, at the least, two factors must be present before a distinction from an arrest could be justified: (1) the time involved must be extremely brief, and (2) it must involve only a stop rather an affirmative command to move somewhere else.[27] Within these narrow confines, it is conceivable that the Fourth Amendment reasonableness standard *might* be satisfied.[28]

The step from a brief stop to a trip to the station house and forced stint in a lineup is a giant step backward to the age of investigatory arrests.[29] To contend

25. Bailey v. United States, 128 U.S.App. D.C. 354, 365 n. 10, 389 F.2d 305, 316 n. 10 (1967) (Leventhal, J., concurring). In his opinion, written before *Terry*, Judge Leventhal finds nothing wrong with stopping citizens to clear up suspicious circumstances but indicates his uncertainty of the effect of a refusal to stand still and answer questions. "[I]t may be that there is just no way of holding someone who reacts that way to police questioning."

26. *See* Yam Sang Kwai v. Immigration and Naturalization Service, 133 U.S.App. D.C. 369, 411 F.2d 683 (1969) (both McGowan, J., concurring and Wright, J., dissenting).

27. *But see* Price v. United States, D.C. Mun.App., 119 A.2d 718 (1956), where this court ruled that a restraint of a person's *full liberty* for even a short period of time is an arrest. (Emphasis added.)

28. The Uniform Arrest Act § 2 (*see* Warner, The Uniform Arrest Act, 28 Va.L. Rev. 315, 344 (1942)), would purported-

ly allow a detention on less than probable cause for up to 2 hours. Delaware adopted this Act, however, it has been interpreted as requiring probable cause for any detention. DeSalvatore v. State, 2 Storey 550, 163 A.2d 244 (Sup.Ct.Del. 1960); United States v. Thompson, 292 F.Supp. 757 (D.Del.1968).

The A.L.I. Model Code of Pre-Arraignment Procedure § 2.02 (Tent.Draft No. 1, 1966) authorizes a detention of only 20 minutes upon less than probable cause. The reason for this shorter time is that the drafters felt that the objectives of any pre-arrest detention should be limited to securing and verifying identification and asking for cooperation. For these purposes, 20 minutes should be more than adequate. *See* Commentary at 98–99.

29. *See* Report and Recommendations of the Commissioners' Committee on Police Arrests for Investigation (1962). It is interesting that only 10 years ago the police were urging that the only way they could control crime was if they could bring suspects into the station on less than prob-

that this is not a formal arrest renders the term "arrest" meaningless. To contend that a citizen can be ordered to a police station against his will and then further ordered to stand on a stage and be viewed, again against his will, and not be under arrest is beyond reason. What does it matter that the lineup is "antiseptic"? The fact that no official record will be kept and therefore the citizen will, hopefully, be spared some public humiliation is irrelevant.[30] I recognize that this is less an "intrusion upon liberty" than placing a man in jail for a few days, yet, nonetheless, both are arrests.

Professor LaFave, a champion of the variable probable cause doctrine, would old this contemplated lineup beyond the permissible limits of the Fourth Amendment. He has stated:

A full lineup—attended by the victims, witnesses, the suspected offender, and his attorney—which displays several other persons bearing some resemblance to the suspect can hardly be arranged within time limits that would pass muster for a temporary seizure. If any attempt is to be made to identify the suspect as the offender or to clear him, it must be done by other means.[31]

The fact that a judge or a magistrate authorizes a violation of the Fourth Amendment does not make that violation legitimate. Courts are likewise bound by the amendment. *See* Aguilar v. Texas, *supra* note 10.

I read Davis v. Mississippi, *supra,* as a significant roadblock to this lineup order. Dicta in that case suggests that in some limited situation it *might* be permissible to take a suspect's fingerprints despite a lack of probable cause.[32] The Court stressed the scientific reliability of that evidence plus the relatively slight intrusion upon personal security. This technique was expressly distinguished from eyewitness identification. It is not that lineups are less scientific than fingerprints; rather, they are not scientific at all. Perhaps a more significant distinction between the two processes is the character of the detention. Fingerprints can be taken anywhere in a matter of minutes. Lineups, however, necessarily involve more time; also, the suspect must be ordered to move rather than merely stop.[33]

In conclusion I wish to stress that I share the majority's concern for "the desperate situation regarding urban safety and lawlessness." Yet, if this nation is to remain free, it is necessary for the judiciary to maintain a perspective and at all times to act in a constitutional manner.

---

able cause. In line with this, thousands of "investigatory arrests" occurred. This practice was condemned and its discontinuance demanded.

These investigatory arrests were, of course, illegal. Gatlin v. United States, *supra.*

30. Is not the use of Mr. Wise's name in this very case a potential source of public humiliation?

31. LaFave, *supra* note 18, at 117.

32. In this regard we cannot take too lightly the Court's statement that:

We have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest.

[394 U.S. at 728, 89 S.Ct. at 1398] It is conceivable that the Court will determine that such procedures are not possible. Such a result would be compelled for instance if *Terry* is limited to situations involving a certain "rubric of police conduct" historically and practically beyond the scope of the Warrant clause. See n. 16 *supra* and accompanying text. We would not then have to look to the concept of variable probable cause to explain the rationale of *Terry.*

33. Fingerprints and palm prints as well as hair samples could easily be obtained in the suspect's own home or even on the street without major inconvenience. If desired, privacy could be obtained and undue public attraction avoided. The whole procedure could be completed in less than a few minutes and a trip to the police station is hardly necessary.

GALLAGHER, Associate Judge, dissenting (in part), with whom Associate Judge FICKLING, joins:

I am concerned that this court has cast aside judicial restraint and entered an advisory opinion on this grave constitutional question. Courts have been cautioned not to do this from time out of mind. *E. g.,* Hayburn's Case, 2 Dall. 409, 1 L.Ed. 436 (1792); United States v. Ferreira, 13 How. 40, 14 L.Ed. 42 (1851); United States v. Evans, 213 U.S. 297, 301, 29 S.Ct. 507, 53 L.Ed. 803 (1909); Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911); United Public Workers (C.I.O.) v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); Barr v. Matteo, 355 U.S. 171, 172, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957); United States .v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 5 L.Ed.2d 476, reh. denied, 365 U.S. 875, 81 S.Ct. 899, 6 L.Ed.2d 864 (1961); Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L. Ed.2d 214 (1969). The record is admittedly so barren as to prevent a square confrontation with the constitutional issue. Before this confrontation may occur there must be no major void in essential facts. So, faced with this void and instead of restraining itself, the court has reached for the abstract concept involved in the lineup order under review and stamped its approval. I hope this will be a one time excursion for the court, for reasons I will give.

As a predicate, it is necessary to understand what the court has done. It considers the new concept of compelling a person to appear in a lineup where reasonable grounds to believe a suspect committed a grave crime (probable cause) are concededly lacking—but some cause to *suspect* he committed it is present—and concludes this accords with the Fourth Amendment and is therefore constitutional. Having done this, it comes to grips with the facts in the case in the waning moments of the

opinion and decides they are so lacking as to prevent an affirmance of the lineup order under review.

When it finally reached consideration of the facts, it did so to determine "whether on the facts as presented the requisite specificity as to articulable facts was present in order to permit meaningful evaluation of the reasonableness of the proposed lineup by the neutral and detached judicial officer." It acknowledges that this "is the constitutional touchstone of such an order." It proceeds to set out various factual voids in the record—but not by any means all of them as far as I am concerned. Then, to my astonishment, the court concludes the facts presented do not enable an evaluation of "the reasonableness of the proposed intrusion against its impact * * * on personal liberty." Yet, it had previously stated it had decided this constitutional issue and had concluded that:

> On balance, and realistically viewing the impact of a court-ordered lineup of the kind here contemplated on liberty, we conclude * * * that the public interest can validly require this intrusion.

And so we have an advance advisory opinion by the majority that the proposed lineup order is constitutional if more, but as yet undetermined, facts can be supplied. This is why "advisory opinions are not merely advisory opinions. They are ghosts that slay."[1]

But, says the majority, the constitutional issue should not be avoided because present resolution of that issue is essential to a proper disposition of the case. This is particularly true, they say, where the question is novel and the public need is so great. But that is just the point. Where, as here, there is a novel constitutional issue which cuts deeply into personal liberties the court should not vault into an opinion which seeks to overthrow generations of precedents on a record concededly lacking in facts essential to decide the issue on the merits. It would be redundant to labor the

---

1. Frankfurter, "A Note on Advisory Opinions", 37 Harv.L.Rev. 1002, 1008 (1924).

great public need these days to solve and prevent crimes of violence in urban areas. I have said as much too many times before.[2] In our anxiety, though, we should not lose sight of the need for preservation of the freedom of the individual. The art lies in the wise balancing of the two needs. In cases involving the eternal conflict between the freedom of the individual and his control by society, "[t]he stuff of these contests are facts, and judgment upon facts."[3]

This court is not "authorized to answer academic questions", White v. Johnson, 282 U.S. 367, 373, 51 S.Ct. 115, 75 L.Ed. 388 (1931). "Constitutional questions are not to be decided hypothetically." Anniston Mfg. Co. v. Davis, 301 U.S. 337, 353, 57 S.Ct. 816, 823, 81 L.Ed. 1143, reh. denied, 302 U.S. 772, 58 S.Ct. 3, 82 L.Ed. 599 (1937), citing Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 208–210, 55 S.Ct. 187, 79 L.Ed. 281 (1934). "[O]nly an adjudication on the merits can provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision." United States v. International Union, etc., 352 U.S. 567, 591, 77 S.Ct. 529, 541, 1 L.Ed.2d 563 (1957). Without facts the issues cannot be presented with the "clarity, precision and certainty"[4] which constitutional decision demands; and " * * * before [a question] of constitutional law, both novel and of far reaching importance, [is] passed upon * * * 'the facts essential to [its] decision should be definitely found by the lower [court] upon adequate evidence.' " Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 212, 55 S.Ct. 187, 193, 79 L.Ed. 281 (1934), citing Hammond v. Schappi Bus Line, 275 U.S. 164, 171–172, 48 S.Ct. 66, 72 L.Ed. 218 (1927). Constitutional questions "are not to be entertained upon dubious presentations or, most certainly, when the presenta-

tion reasonably may be taken as not intended to put them forward squarely and inescapably." Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 763, 67 S.Ct. 1493, 1498, 91 L.Ed. 1796 (1947). "Counsel are prone to shape litigation, so far as it is within their control, in order to secure comprehensive rulings. This is true both of counsel for defendants and for the Government. Such desire on their part is not difficult to appreciate. *But the Court has its responsibility.*" United States v. International Union, etc., *supra,* 352 U.S. at 592, 77 S.Ct. at 541. (Emphasis added.)

So, rather than there being a necessity to decide the constitutionality of the abstract concept involved here, there is a duty to avoid deciding because of the factual void. *E. g.,* Morales v. New York, 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969); United States v. International Union, etc., *supra,* 352 U.S. at 591–592, 77 S.Ct. 529; District of Columbia v. Little, 339 U.S. 1, 3–4, 70 S.Ct. 468, 94 L.Ed. 599 (1950); Aircraft & Diesel Equipment Corp. v. Hirsch, *supra;* Rescue Army v. Municipal Court, *supra,* 331 U.S. at 575–576, 67 S.Ct. 1409.

When the majority does wrestle with the facts—or rather the lack of them—it sets out several lines of inquiry to be pursued. It is striking that it does so because "[u]nder the limited facts presented the proposed lineup 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than [possible] inarticulate hunches * * *.' " Having enumerated factors to be explored, the majority concludes that "[t]here is every reason * * * for the police to disclose all factors they possess shedding light *on the likelihood* that the tentative identification[5] is the correct one." (Emphasis added.)

2. *See, e. g.,* United States v. Frye, D.C. App., 271 A.2d 788 (1970); Gaskins v. United States, D.C.App., 262 A.2d 810 (1970); Clarke v. United States, D.C. App., 256 A.2d 782 (1969).

3. Frankfurter, *supra* note 1, at 1002.

4. Rescue Army v. Municipal Court, 331 U.S. 549, 576, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

5. I do not consider that the pertinent statement of the complainant rises to the dignity of a "tentative identification."

**228**

As I read the factors to be explored, the majority is requiring that the Government obtain what may well amount to *probable cause to arrest*.[6] I must say this is a curious result after a laborious opinion deciding the constitutionality of a hypothetical lineup order bottomed on suspicion rather than the traditional probable cause to arrest. It demonstrates the recklessness of deciding serious constitutional issues without essential facts. How can the majority opinion be read with any confidence as to what is *really* being decided?

I agree, of course, that anything which may lead to probable cause to arrest should be pursued. But this course taken by the majority simply compounds my puzzlement as to why they have rendered an advisory opinion on the constitutionality of the proposed lineup order. I might add that I am just as puzzled as to why the judicial officer took the extraordinary step of entering this novel lineup order carrying with it such far-reaching implications with little or no factual inquiry apparent on his part. The record expressly leaves open, for example, whether the Government has so much as explored whether the suspect would voluntarily submit to interrogation (Tr. 14–16). It contains no indication that all investigative avenues have been explored and the request for the lineup order was a last resort; nor does it show whether the usual examination of the rape victim was made for specimens. In fact, it contains no testimony at all.

The majority points to Morales v. New York, *supra,* as supporting the validity of the contemplated lineup order. But *Morales* does no such thing. There, in connection with a confession by the defendant, the Court had before it whether the police "may detain for custodial questioning on less than probable cause for a traditional arrest * * *." *Id.* at 104–105, 90 S.Ct. at

293. The Court concluded that the record did not permit a satisfactory evaluation of the facts surrounding the apprehension and detention of the defendant. It said that an evidentiary hearing might develop that (1) there was probable cause for an arrest, or (2) the defendant's confrontation with the police was voluntary, or (3) the confession was not the product of illegal detention. But, said the Court, "in the absence of a record that *squarely* and *necessarily* presents the issue and *fully illuminates the factual context in which the question arises,* we choose not to grapple with the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id.* at 105–106, 90 S.Ct. at 293. (Emphasis supplied.)

I should think the only lesson to be drawn from *Morales* is that this court should not grapple now with the novel and grave constitutional issue presented here for precisely the same reason.

The majority places similar reliance upon the Circuit Court's interim order in Shaykar v. Curran (No. 24,826). But that court seemed at pains to make clear that it was following the unusual procedure concerning the scientific samplings "* * * to balance the need of this Court for more time to consider these novel questions fully with the need of the Government for expedition and efficiency in its criminal investigation processes * * * [and] it is intended as a means of presenting the issues. * * *" I think we should take the court at its word and not strain to draw the conclusion, as the majority does, that the court has already adjudged the constitutionality of the procedures when the court said it has not.[7]

In my view, the ruling that "the contemplated lineup" is constitutionally permissible may not prudently be relied upon as a binding precedent because judicial restraint

6. This carries with it the necessary implication that if additional inquiry brings substantially negative results a further lineup order involving the suspect should not be entered.

7. It may be that the Circuit Court will eventually endorse some such procedures relating to scientific evidence but the point is that conclusion has not been reached as yet.

went out the window, and the court sought to decide this serious constitutional question virtually in a vacuum, with the resulting infirmities I have related. In doing so the majority went contrary to reams of Supreme Court decisions going back to the "foundation of the government." Baker v. Grice, 169 U.S. 284, 292, 18 S.Ct. 323, 42 L.Ed. 748 (1898). This is the way a court incurs "self-inflicted wounds." [8]

The unprecedented order so lightly entered by the judicial officer should not stand; and I agree with the majority to this limited extent.[9] Because of the grossly inadequate record in this case, I would vacate the order without a pause to entertain the questions otherwise raised.

8. Charles Evans Hughes, The Supreme Court of the United States, 50.

9. I am also in accord on the agreed dismissal of the companion case in No. 4480

Original, Clarence Wise v. The Honorable Tim Murphy et al.