In re Thomas A. LIBERATORE,
Appellant.

No. 352, Docket 77–1384.

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1977.

Decided Feb. 24, 1978.

Jon C. Blue, Legal Assistance to Prisoners, Hartford, Conn. (Richard S. Cramer, Asst. Federal Public Defender, Hartford, Conn., on the brief), for appellant.

Hugh W. Cuthbertson, Asst. U. S. Atty., New Haven, Conn. (Richard Blumenthal, U. S. Atty., New Haven, Conn., on the brief), for appellee.

Before WATERMAN, ANDERSON and MANSFIELD, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from an order of the United States District Court for the District of Connecticut, Clarie, C. J., adjudging Thomas A. Liberatore to be in civil contempt of court for his refusal to comply with a court order directing him to provide a grand jury in the District of Connecticut with handwriting exemplars and so-called "major case" prints. The adjudication of contempt of court from which Liberatore appeals contained two operative provisions. The first such provision commanded that Liberatore be held in federal confinement until the expiration of the federal grand jury's term in April of 1978,[1] unless prior to that time the contemnor were to purge himself of his contempt by providing the material requested by the grand jury. Liberatore was serving a Connecticut state sentence of imprisonment at the time of his contempt of the federal court, and the second operative provision required that the state sentence of imprisonment be suspended during the period of his federal confinement. Challenging the order of contempt in its entirety, Liberatore presents three contentions on appeal. Two of these points assail the propriety of the procedures by which Liberatore was adjudged to be in

---

1. The order adjudging Liberatore in contempt committed him to the custody of the Attorney General of the United States, but recommended that his federal sentence on the contempt charge be served, subject to the approval of the Attorney General of the United States, at a state penal institution. Liberatore was, in fact, returned to and has continued to be confined at the same correctional facility, the Connecticut Correctional Institution in Somers, where at the time of his contempt of the federal court he was serving his preexisting sentence imposed as a result of his conviction on various charges of violations of Connecticut law.

civil contempt of the federal court. His first contention is that he was not afforded adequate notice of or opportunity to defend against the charge of civil contempt; the second is that the government failed to demonstrate the relevance and necessity of the prints and handwriting exemplars sought by the grand jury. We conclude that each of these contentions is easily refuted, either on its merits or because it was not presented, as it should have been, to the district court below. However, while we are not persuaded that there is any basis for reversing the district court order which adjudged Liberatore to be in civil contempt of court and mandated his conditional confinement, we do agree with appellant's principal argument on appeal, namely, that the federal district court lacked authority to interrupt the service of the state sentence Liberatore was already serving for his prior convictions on various state charges. Accordingly, we reverse the district court's order insofar as that order purported to mandate the interruption of Liberatore's preexisting state sentence.

The salient facts are simply recited. On September 15, 1976, Liberatore, following his conviction in the Connecticut state courts on charges of six violations of state law, was sentenced to two consecutive one-year sentences. Liberatore began to serve his state sentences immediately and, if during his term in state prison he were to earn the maximum amount of "good conduct time" to which he would be entitled under Connecticut law, the earliest date he could expect to be released from state custody would be January 19, 1978.[2]

Meanwhile, on June 14, 1977, when Liberatore was exclusively in state custody at the Connecticut Correctional Institution in Somers, the federal prosecutors in the District of Connecticut obtained a writ of *habeas corpus ad testificandum* for the purpose of having Liberatore appear on June 29, 1977 before a federal grand jury in the District of Connecticut which was then in-

vestigating possible violations of the federal criminal statutes prohibiting forgery and uttering, 18 U.S.C. § 495, and possession of stolen mail, 18 U.S.C. § 1708. Upon appearing before the grand jury, Liberatore was asked to provide handwriting exemplars and "major case fingerprints." Liberatore refused on fifth amendment grounds, and the federal prosecutors thereupon requested and were granted a hearing at which they sought an order from the district court directing Liberatore to provide the handwriting sample and prints.

The hearing was conducted later that same day. In support of its application for an order compelling compliance with the grand jury's request, the government submitted an affidavit of the Assistant United States Attorney in charge of the proceedings before the grand jury and offered the testimony of the grand jury foreman. While persisting in his refusal to supply the materials requested, Liberatore now advanced as a justification for his refusal a ground different from the fifth amendment ground he had earlier asserted before the grand jury. Liberatore now predicated his refusal to provide the exemplars and the prints upon the ground of "lack of necessity," that is, that there was no need for him to provide the materials requested inasmuch as each type of evidence was supposedly already on file elsewhere in some law enforcement records to which the federal government had ready access. The government responded that the prints and the handwriting sample were, in fact, necessary. More particularly, the federal prosecutor argued that the accuracy of handwriting analysis is substantially enhanced by having the handwriting written on a standard analysis form and, although the federal prosecutor did not dispute that the government may well have had access to samples of Liberatore's handwriting, the government did not at that point have available to it Liberatore's handwriting on

---

**2.** January 19, 1978 is the date which the government asserts in its brief is the earliest date on which Liberatore might be released from state custody. However, during the hear-

ing held to consider whether he should be held in contempt of court, Liberatore represented to Judge Clarie that his earliest possible release date would be January 24, 1978.

a standard government handwriting analysis form. As to the need for the major case prints, the government stated it needed these because it did not have available to it any of Liberatore's prints which depicted not only the tips of Liberatore's fingers but the print of the lobe of his thumb and of his palm as well.

Satisfied with the government's presentation, the district court orally granted the government's motion for an order compelling Liberatore to provide the handwriting sample and the prints. After ascertaining that Liberatore had been fully and accurately advised by his counsel concerning the consequences of his refusal to comply with a court order compelling production of the materials the grand jury was seeking and after assiduously warning Liberatore that, were he to persist in his contumacious conduct, he would be held in civil contempt of court, would be incarcerated until he decided to comply with the court's order compelling him to provide the materials or until the expiration of the grand jury's term, whichever occurred first, and would have the running of the state sentence he was then serving tolled while he remained in federal confinement for civil contempt, Judge Clarie offered Liberatore one final opportunity to agree to cooperate. Notwithstanding the consequences which had been carefully explained to him by his attorney and the judge, Liberatore reasserted his absolute refusal to comply with the court order compelling production. Thereupon the judge, as he had indicated he would, held Liberatore in contempt. The substance of this oral ruling was incorporated into a written order Judge Clarie issued later that afternoon. It directed that Liberatore be held in federal custody [3] until the expiration of the grand jury's term in April of 1978, unless prior to that time the contemnor decided to supply the prints and the handwriting sample which had been requested by the grand jury. At this point the court's written order directing confinement did not, however, direct that the running of Liberatore's preexisting state sentence be suspended during the period of his federal confinement. At no point either before or at the time the order adjudging him in contempt of court was issued did Liberatore raise any objection that he had not been afforded adequate notice of or opportunity to defend against the charge of civil contempt.

Approximately one month later, on July 29, 1977, Liberatore filed a memorandum with the court, raising for the first time the argument that he had not been given sufficient notice of the contempt charge or ample opportunity to prepare a defense to it. Liberatore also contended in this memorandum that the district court ought not direct that the service of his state sentence be interrupted during the period of his confinement for civil contempt of the federal district court. The district court rejected Liberatore's entreaties and, by virtue of a "substitute order" entered on August 2, 1977, formalized its previously expressed intention that the running of Liberatore's state sentence be suspended while he remained in federal confinement.

Liberatore presently remains confined at the Connecticut Correctional Institution in Somers, the facility at which he was serving his preexisting state sentence and to which he was committed pursuant to Judge Clarie's order of confinement.

I

■ Liberatore's arguments directed to the validity of the contempt order as a whole need not detain us long. First, inasmuch as the point was not properly preserved before the district court, we need not, and do not, reach the merits of Liberatore's argument that he did not receive adequate notice of the application for contempt to allow him to prepare a defense to it. We have reviewed the transcript of the hearing held to consider the government's joint applications for orders compelling compliance with the grand jury's demands and adjudging Liberatore in contempt, and we find that, in the words of Liberatore's

3. *See note 1 supra.*

own counsel, Liberatore's "only objection, for the record" was that, inasmuch as the material was available to the government elsewhere, he should not be required to produce the material now being requested because the government had no "need" for the handwriting sample or prints it was endeavoring to have Liberatore provide to the grand jury. However, in no manner whatever did Liberatore contend, or even intimate, that the notice he had received was inadequate to comply with the requirements of Rule 42(b) of the Federal Rules of Criminal Procedure, applicable here under our decision in *In re Sadin*, 509 F.2d 1252, 1255–56 (2d Cir. 1975). Having failed to preserve the point before the district court, Liberatore has waived the issue, *e. g., In re Grand Jury Investigation (Appeal of Hartzell)*, 542 F.2d 166, 168 (3d Cir. 1976), *cert. denied*, 429 U.S. 1047, 97 S.Ct. 755, 50 L.Ed. 2d 762 (1977); *Wilkerson v. Meskill*, 501 F.2d 297, 298 (2d Cir. 1974); *In re Chinese Maritime Trust, Ltd.*, 478 F.2d 1357, 1359 n. 1 (2d Cir. 1973), *cert. denied*, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974), and we therefore do not consider it on appeal. Parenthetically, we might add that if the point were based on what Liberatore's counsel perceived to be a truly serious procedural deprivation which handicapped his ability to defend his client against the contempt charge, then he surely had ample enough opportunity to bring the matter to Judge Clarie's attention at some point during the comprehensive hearing the judge held upon the government's application for an order of contempt. And, of course, Liberatore should not now be permitted to assert as a basis for reversal this alleged procedural deficiency which Judge Clarie could easily have rectified had he been alerted to it at the time it supposedly developed.

■ We also quickly dispose of Liberatore's arguments that the order adjudging him in contempt was erroneously entered because the government failed to make preliminary showings of the relevance and necessity of the fingerprints and handwriting exemplars sought by the grand jury. As to the purported requirement that the government make a preliminary showing of the relevance of the prints and the exemplars, we find that, first of all, at the hearing held to consider whether Liberatore should be adjudged in contempt of court, Liberatore did not raise his contention that the government must bear the burden of making a preliminary showing of the relevance of the prints and the handwriting exemplars sought by the grand jury, and the point has therefore not been properly preserved for presentation on appeal here. *E. g., In re Grand Jury Investigation (Appeal of Hartzell), supra*, 542 F.2d at 168. However, in view of the recurrent nature of the problem, and inasmuch as "the proper resolution [of the issue] is beyond any doubt," *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *accord, Turner v. City of Memphis*, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962), it is perhaps advisable for us to reach the merits and confirm what should be manifest from recent decisions in this circuit and in the United States Supreme Court. Specifically, it is abundantly clear after our own decision in *United States v. Doe (Schwartz)*, 457 F.2d 895, 899–901 (2d Cir. 1972) (Friendly, C. J.), *cert. denied*, 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973), and the Supreme Court's rulings in *United States v. Mara*, 410 U.S. 19, 21–22, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), and *United States v. Dionisio*, 410 U.S. 1, 15–18, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), that, under prevailing constitutional standards, the government has no burden whatever to make a preliminary showing that handwriting or voice exemplars or fingerprints are relevant to a grand jury investigation then in progress, for the compelled production of such evidence implicates no constitutional rights and "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States v. Dionisio, supra*, 410 U.S. at 17, 93 S.Ct. at

773.[4]  This is not to say, of course, that the grand jury is endowed with an absolute license to seek evidence not relevant to its investigative function but we are only saying that the government does not in each and every case bear the constant burden of initially showing the relevance of the particular evidence sought to be produced by way of subpoena.  Instead, the party seeking to quash a subpoena must carry the burden of showing that the information sought bears "no conceivable relevance to any legitimate object of investigation by the federal grand jury."  *In re Morgan*, 377 F.Supp. 281, 284 (S.D.N.Y.1974) (Gurfein, J.), quoting *In re Horowitz*, 482 F.2d 72, 80 (2nd Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).  Finally, the weakness of Liberatore's argument that the government must make a preliminary showing of relevance is revealed by the fact that the sole authority upon which he relies is *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963 (3d Cir.), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), and, necessarily, also on its predecessor, *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85 (3d Cir. 1973).  Those decisions are predicated entirely upon the Third Circuit's supervisory powers over the conduct of civil proceedings within that circuit and upon the federal courts' supervisory power over grand juries and they are in no way whatever based on constitutional grounds.  507 F.2d at 965–66; *id.* at 968–69, 95 S.Ct. 2424 (Aldisert, J., dissenting).  It is equally clear that the *Schofield* standards do not constitute the law in this circuit, *see, e. g., United States v. Doe (Schwartz)*, *supra*, 457 F.2d at 899–901; *In re Morgan*, *supra*, 377 F.Supp. at 284, and, even if they did, Liberatore's argument concerning relevancy is completely destroyed by his concession that the affidavit which the government submitted was entirely sufficient under the *Schofield* standards to establish that the evidence the grand jury sought was relevant to a legitimate objective of a grand jury investigation.

Turning now to Liberatore's contention that the order adjudging him in contempt must be reversed because the government failed to make a preliminary showing that it was "necessary" that the materials sought be obtained by compulsion of a grand jury subpoena, we conclude that this contention too is foreclosed by the Supreme Court's decisions in *United States v. Dionisio, supra*, and *United States v. Mara, supra*.  By urging that we hold that "necessity" be shown, Liberatore would have us rule that the grand jury here was not entitled to demand production of the prints and the handwriting exemplars unless the government could demonstrate that that evidence was not already in the government's possession and, further, that the evidence demanded could not be obtained by the government through the use of some other, less coercive, means.  In addition to the Supreme Court's generalized refusal to "saddle [the] grand jury with minitrials and preliminary showings," *United States v. Dionisio, supra*, 410 U.S. at 17, 93 S.Ct. at 773, the Court in *Mara*, in reversing the Seventh Circuit, rejected the position of the lower court that there was a requirement that the government "show [in a preliminary adversary hearing] why satisfactory . . . exemplars cannot be obtained from other sources without grand jury compulsion," *United States v. Mara, supra*, 410 U.S. at 21, 93 S.Ct. at 775; *see United States v. Dioniso, supra*, 410 U.S. at 17 n. 16, 93 S.Ct. 764.  Indeed, that very requirement of necessity which the Seventh Circuit had imposed upon the government, and which the Supreme Court so swiftly nullified, was offered by the Court as an illustration of one of "[t]he possibilities for delay caused by requiring initial showings of 'reasonableness.'"  *United States v. Dionisio, supra*, 410 U.S. at 17 n. 16, 93 S.Ct. at 773.  Finally, if there were any requirement that the government demonstrate its

---

4.  In *United States v. Mara*, the "preliminary showing of 'reasonableness,'" 410 U.S. at 22, 93 S.Ct. 774, which the Court held the government was not obligated to make included a "substantive showing . . . 'that the information sought is relevant to the [grand jury's] inquiry,'" 410 U.S. at 21, 93 S.Ct. at 775.

need to obtain the handwriting exemplars and prints through the compulsion of a grand jury subpoena here, we would not hesitate to find that the Assistant United States Attorney, in his response to Liberatore's assertion at the contempt hearing that the government already had access to the materials it sought through grand jury subpoena, made a satisfactory demonstration of need before Judge Clarie.

## II

Raising an issue not previously considered by us or by any other court, Liberatore's primary argument on appeal is that the district court below lacked authority to interrupt the *state* sentence Liberatore was serving at the time he was adjudged to be in civil contempt of the federal court.[5] Despite the fact that six courts of appeals have already ruled that a federal court has the power to interrupt a *federal* criminal sentence during the time the contemnor is incarcerated for civil contempt of the federal court, see In re Grand Jury Investigation (Appeal of Hartzell), supra, 542 F.2d at 169; In re Grand Jury Proceedings (United States v. Thurmond), 534 F.2d 41, 42 (5th Cir. 1976); In re Grand Jury Proceedings (United States v. Marshall), 532 F.2d 410, 411 (5th Cir.) (per curiam), cert. denied, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976); Martin v. United States, 517 F.2d 906, 908 (8th Cir.), cert. denied, 423 U.S. 856, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); Williamson v. Saxbe, 513 F.2d 1309, 1310 (6th Cir. 1975) (per curiam); United States v. Liddy, 166 U.S.App.D.C. 289, 291, 510 F.2d 669, 671 (1974), cert. denied, 420 U.S. 980, 95 S.Ct. 1408, 93 L.Ed.2d 661 (1975); Anglin v. Johnston, 504 F.2d 1165, 1169 (7th

Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975), we conclude that under the circumstances here Liberatore is correct. We therefore reverse so much of Judge Clarie's order as directed the suspension of the running of Liberatore's preexisting state sentence.

■ We start with the rudimentary proposition, for which no authority need be cited, that a federal court can act only upon the basis of some statutory or constitutional authority or, alternatively, upon the basis of some inherent power of the federal judiciary. We have not discovered, nor have we been directed to, any such express or inherent power which might justifiably predicate Judge Clarie's order interrupting Liberatore's state sentence, and the only conceivable statutory basis for the order of suspension is the one urged upon us by the government here, 28 U.S.C. § 1826(a), which provides as follows:

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury,

---

5. Although as already discussed, Liberatore does believe that there were certain procedural deficiencies in the proceedings which culminated in his being adjudged to be in contempt of court, he does not claim that the district court lacked authority to order his confinement solely because of his status as a state prisoner. Liberatore's view of § 1826 is that the statute simply allows the Court to order that a recalcitrant witness be "confined"—i. e., imprisoned during the prescribed period of time. If that witness is already incarcerated, the statute gives the Court authority to see that his

confinement continues uninterrupted—ensuring, for example, that he remains imprisoned if his pre-existing conviction should be reversed on appeal (Appellant's brief at 9). There is thus no issue in this case as to Judge Clarie's authority to impose a civil contempt sentence that will run concurrently with the contemnor's preexisting state criminal sentence. Moreover, under the circumstances we need not consider any issues pertaining to which sovereignty had what sort of custody over Liberatore.

including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

In determining whether this statute expressly or by necessary implication provides the authority which a federal court would need to interrupt the service of a state sentence, there are significant reasons why we believe the provision must be strictly construed. First, while we certainly should not be understood as expressing any opinion on the existence of any constitutional infirmities, it has been suggested that such infirmities may inhere in the interruption of a preexisting criminal sentence, *see In re Grand Jury Investigation (Appeal of Hartzell), supra,* 542 F.2d at 173 (Aldisert, J., dissenting); *id.* at 175 (Aldisert, J., opinion sur denial of petition for rehearing); *United States v. Liddy, supra,* 166 U.S.App.D.C. at 302–303, 510 F.2d at 682–83 (MacKinnon, J., dissenting), and the fact that such problems may lurk in the background is certainly a factor weighing against any broad construction of the statute which might unnecessarily precipitate those problems and make it incumbent upon us to address and resolve them. *See, e. g., International Association of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) ("Federal statutes are to be so construed as to avoid serious doubt of their constitutionality."); *United States v. Oates,* 560 F.2d 45, 80 (2d Cir. 1977); *In re Grand Jury Investigation (Appeal of Hartzell), supra,* 542 F.2d at 170 (Aldisert, J., dissenting). Second, it appears that there have been general historical limitations upon the power of even the original sentencing court to interrupt or modify its own criminal sentence. *See, e. g., In re Grand Jury Investigation (Appeal of Hartzell), supra,* 542 F.2d at 169–70 (Aldisert, J., dissenting); *Martin v. United States, supra,* 517 F.2d at 911–12 (Heaney, J., dissenting); *United States v. Liddy, supra,* 166 U.S.App.D.C. at 297, 298, 510 F.2d at 678–80 (MacKinnon, J., dissenting). Thus, to the extent that § 1826 is alleged to have revised these limitations upon judicial power to alter a preexisting criminal sentence, that statute would oper-

ate in derogation of the common law and should therefore be strictly construed. *E. g., United States v. Mead,* 426 F.2d 118, 123 n. 5 (9th Cir. 1970) ("If a change in the common law is to be effectuated, the legislative intent to do so must be clearly and plainly expressed."); *Bauers v. Heisel,* 361 F.2d 581, 587–88 (3d Cir. 1966), *cert. denied,* 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967); E. Crawford, The Construction of Statutes § 248, at 486–87 (1940). Third, in contrast to the situation which obtains when a federal court, in order to coerce a recalcitrant witness by incarcerating him for civil contempt of the federal court, interrupts the serving of a federal criminal sentence for the duration of coercive confinement, the federal court is tampering with a valid final judgment of a court of a different sovereignty when it mandates the interruption of the serving of a state sentence of incarceration. In the latter situation, the situation here before us, serious problems arise concerning the rights and responsibilities of a federal court under the concepts of comity, as those concepts have been delineated in a long line of United States Supreme Court cases. *E. g., Covell v. Heyman,* 111 U.S. 176, 182–83, 4 S.Ct. 355, 28 L.Ed. 390 (1884). To the extent, if any, that § 1826 is alleged to permit such tampering, it operates in derogation of deeply rooted common law conceptions of comity, and the statute must therefore be strictly construed, *Bauers v. Heisel, supra,* 361 F.2d at 587–88, for there is "a presumption against an intention to change existing law." *Johnson v. Southern Pacific Co.,* 196 U.S. 1, 17, 25 S.Ct. 158, 161, 49 L.Ed. 363 (1904).

Keeping in mind these significant factors which militate in favor of a strict construction of § 1826, we conclude that under the circumstances here that statute cannot provide a basis for interrupting Liberatore's state criminal sentence. It is important to note, first of all, that the provision itself says absolutely nothing about the power of a federal court to interrupt an existing criminal sentence, and, furthermore, during the congressional debates preceding the

statute's adoption there was no discussion of or allusion to the problem of the contemnor who is already incarcerated on other charges. Liberatore argues that § 1826 was not designed to cope with this problem. We tend to agree that the statute does not appear to have been designed to deal with a contemnor who is already incarcerated. *United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), while not deciding the point, certainly intimates as much. In particular, the Court noted, 421 U.S. at 317 n. 9, 95 S.Ct. at 1807, that the admonition that a court should first consider the possibility of imposing civil rather than criminal contempt "carrie[d] little weight [there] because at the time [the contemnors in *Wilson* ] acted contemptuously both . . . were incarcerated due to their own guilty pleas. Under [such] circumstances . . . the threat of immediate confinement for civil contempt would have provided little incentive for them to testify." Historically also, it seems that the typical way of dealing with contemnors who were already incarcerated on other charges at the time of their contumacious conduct was to impose a criminal contempt sentence to be served following the completion of the contemnor's service of his preexisting criminal sentence. *See, e. g., Piemonte v. United States*, 367 U.S. 556, 559, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961); *Reina v. United States*, 364 U.S. 507, 509, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960); *Martin v. United States, supra*, 517 F.2d at 913–14 (Heaney, J., dissenting). The historical approach is, moreover, especially important inasmuch as the explicit congressional intent behind § 1826 was not to alter existing practices but only to "codify" them. H.R.Rep.No. 1549, 91st Congress, 2d Sess. 33 (1970), reprinted in [1970] U.S.Code Cong. & Admin.

News pp. 4007, 4008 (§ 1826 "is intended to codify present civil contempt practice with respect to recalcitrant witnesses in Federal grand jury and court proceedings."); H.R. Rep.No. 1549, 91st Cong., 2d Sess. 46 (1970), reprinted in [1970] U.S.Code Cong. & Admin. News pp. 4007, 4022 ("The procedure is designed to codify present practice."); *In re Grand Jury Investigation (Appeal of Hartzell), supra*, 542 F.2d at 173 (Aldisert, J., dissenting).[6] While there is more than ample enough evidence that it was an existing practice to utilize criminal contempt against contemnors who were already incarcerated, "[i]t cannot be said that sandwiching a civil contempt sentence within a sentence then being served was 'present practice' in 1970. Published accounts disclose no attempt by the Justice Department to resort to this gimmick until February 20, 1973, when it inaugurated the practice in *Martin v. United States . . . .* Thereafter, it adopted the practice elsewhere." *In re Grand Jury Investigation (Appeal of Hartzell), supra*, 542 F.2d at 173 (Aldisert, J., dissenting); see *Martin v. United States, supra*, 517 F.2d at 914 (Heaney, J., dissenting). Indeed, we find only one published case in which the technique of sentence interruption has *ever* been attempted for the purpose of "sandwiching" a confinement for contempt; and there, *Williams v. State*, 125 Ark. 287, 188 S.W. 826 (1916), the Arkansas Supreme Court reversed a lower court order purporting to suspend the running of the contemnor's preexisting criminal sentence.[7]

Despite the absence of any express language authorizing interruption of a preexisting sentence and notwithstanding the expressed, and modest, Congressional intent merely to codify existing practice, the government nonetheless asserts that § 1826 *does* provide a basis for Judge Clarie's order

**6.** 116 Cong.Rec. 588 (1970) (remarks of Senator McLellan); *id.* 35196 (remarks of Representative Cellar); *id.* 35200 (remarks of Representative Poff); *id.* 35291 (remarks of Representative Poff); *see id.* 35304 (remarks of Representative Railsback).

**7.** The court in *In re Grand Jury Investigation (Appeal of Hartzell), supra*, 542 F.2d at 169 n. 2 stated:

> [It] is our belief that whatever jurisdictional limitations originally existed on a contempt court's power to toll the running of a criminal sentence pending service of a civil contempt sentence, such limitation did not survive the enactment of § 1826.

In view of the express congressional desire merely to "codify" existing practices, the Third Circuit's statement is puzzling at best.

interrupting the service of Liberatore's state sentence. In support of its position the government relies upon those cases which have held that a federal court can suspend the service of a federal criminal sentence for the purpose of "sandwiching" within that sentence a federal sentence for civil contempt. *See, e. g., In re Grand Jury Investigation (Appeal of Hartzell), supra; Martin v. United States, supra; United States v. Liddy, supra; Anglin v. Johnston, supra.* These cases proceed on various disparate · theories. Insofar as they are grounded upon a "fault of the prisoner" theory, *see, e. g., United States v. Liddy, supra,* 166 U.S.App.D.C. at 294–295, 510 F.2d at 674–75; *Anglin v. Johnston, supra,* 504 F.2d at 1167–68, we believe they are wrongly decided[8] and, to the extent that any of them may regard 18 U.S.C. § 3568 as an affirmative basis supporting the authority of a federal court to interrupt a federal criminal sentence to interpose a federal civil contempt sentence, *see Martin v. United States, supra,* 517 F.2d at 909, the cases are clearly inapposite to the situation here in which the criminal sentence being interrupted is one which was imposed by a state court rather than by a federal court.

We note also that, although we do not rest our decision on the distinction, leaving for another day any comprehensive analysis of it, Liberatore's case may well differ from the situation in *Liddy* and *Martin* inasmuch as in each of those cases "[h]ad the District Court ordered that [the contemnor's] contempt confinement be concurrent with his sentence for [criminal offenses, the con-

temnor] would have no incentive to comply with the District Court's order since his doing so would not reduce his total period of confinement." *United States v. Liddy, supra,* 166 U.S.App.D.C. at 295, 510 F.2d at 675. *See Martin v. United States, supra,* 517 F.2d at 907 (contemnor had only begun serving his ten-year sentence for drug distribution one month before the inception of his seven-month confinement for civil contempt of court). Here, in contrast, if, as appears likely, the maximum possible duration of Liberatore's incarceration for civil contempt exceeds the minimum possible criminal sentence he might serve, then an argument could be made that Liberatore had an incentive to comply that the contemnors in *Liddy* and *Martin* lacked.

The truly compelling and pivotal distinction between the situation here and that present in the cases which have upheld a federal district court's right to interrupt an existing federally-imposed criminal sentence is, of course, the fact that here Judge Clarie did not order the interruption of a federal sentence but the interruption of a *state* sentence of unquestioned legality. In view of what we find to be time-honored precedent barring a federal court from engaging in such an intrusion upon the legitimate jurisdiction of the courts of a different sovereignty, we hold that, irrespective of whether in some circumstances the "recalcitrant witness statute" might empower a federal district court to interrupt the running of a preexisting *federally-imposed*

---

8. Judge MacKinnon, dissenting in *United States v. Liddy, supra,* 166 U.S.App.D.C. at 304, 510 F.2d at 684 (footnote omitted), exposed the fallacy in this theory:

> The majority reasons that appellant's "intentional acts" place him in a position similar to that of an escapee or a parolee who commits offenses which lead to revocation of his parole. Even those do not authorize a *sentencing court* to change the sentence originally imposed on the initial offense. But appellant's fault is of a different order from an escape or parole violation. His refusal to testify before the grand jury does not come within the *McDonald v. Lee* exception because it is not the fault of a prisoner *qua* prisoner; rather, it is an act totally extrane-

ous to his imprisonment. In contrast to the other transgressions cited by the majority, appellant's refusal to testify ·does not evince any intent to avoid or terminate service of his sentence. Moreover, his silence before the grand jury is an "intentional act" only in an oblique and technical sense. Appellant displayed every intention of serving his term promptly and continuously; any argument that he willfully interrupted his sentence is sophistical.

*See Martin v. United States, supra,* 517 F.2d at 911–12 (Heaney, J., dissenting). It is significant, moreover, that even the majority in *Martin* also expressly disavowed any reliance on the "fault of the prisoner" theory. *See* 517 F.2d at 909; *id.* at 912 (Heaney, J., dissenting).

criminal sentence, § 1826 cannot serve to justify a federal court's interruption of a preexisting *state-imposed* criminal sentence.[9] Moreover, the well-established principles of comity require that we hold also that the district court had no inherent authority to interrupt Liberatore's state sentence.

■ The fundamental principles of comity upon which we reach our holding here are not of recent origin. Being rules of practical necessity, without which our political system of independent sovereignties could not function, they were formulated early in the nation's history, having been articulated and followed in a series of United States Supreme Court cases extending back into the early nineteenth century. *E. g., Ponzi v. Fessenden,* 258 U.S. 254, 259–61, 42 S.Ct. 309, 66 L.Ed. 607 (1922); *Covell v. Heyman,* 111 U.S. 176, 181–85, 4 S.Ct. 355, 28 L.Ed. 390 (1884); *Taylor v. Taintor,* 83 U.S. (16 Wall.) 366, 370, 21 L.Ed. 287 (1873); *Taylor v. Carryl,* 61 U.S. (20 How.) 583, 595–97, 15 L.Ed. 1028 (1858); *Hagan v. Lucas,* 35 U.S. 400, 403, 10 Pet. 263, 266, 9 L.Ed. 470 (1836). A concise statement of the doctrine controlling the disposition of this appeal is contained in *Taylor v. Taintor, supra,* 83 U.S. (16 Wall.) at 370 (footnote omitted), the Court there explaining:

> Where a State court and a court of the United States may each take jurisdiction, the tribunal which first gets it holds it to the exclusion of the other, until its duty is fully performed and the jurisdiction invoked is exhausted: and this rule applies alike in both civil and criminal cases. It is indeed a principle of universal jurisprudence that where jurisdiction has attached to person or thing, it is—unless there is some provision to the contrary—

exclusive in effect until it has wrought its function.

Nearly 50 years later, in *Ponzi v. Fessenden, supra,* 258 U.S. at 260, 42 S.Ct. at 310, the Court again recognized that "[t]he chief rule which preserves our two systems of courts from actual conflict of jurisdiction is that the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose." The reason for such a rule could not be more obvious; nor could it be more compelling. As explained by the Court in *Covell v. Heyman, supra,* 111 U.S. at 182–83, 4 S.Ct. 355 and restated in *Ponzi v. Fessenden, supra,* 258 U.S. at 260–61, 42 S.Ct. at 310:

> The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between State courts and those of the United States, it is something more. It is a principle of right and of law, and therefore, of necessity. It leaves nothing to discretion or mere convenience. These courts do not belong to the same system, so far as their jurisdiction is concurrent; and although they co-exist in the same space, they are independent, and have no common superior. They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that *res* is as much withdrawn from the

---

9. We should note also that there appear to have been feasible alternative methods for achieving the desired result of coercing Liberatore's testimony. Specifically, the district court could have imposed a criminal contempt sentence of definite duration and coupled the imposition of such a sentence with "[a] promise to consider subsequent compliance in ruling on any Rule 35 motion for reduction of sentence." *Martin v. United States, supra,* 517 F.2d at 914 n. 11 (Heaney, J., dissenting); *ac-*

cord, *United States v. DiMauro,* 441 F.2d 428, 431 (8th Cir. 1971). Moreover, there are other alternatives which might have been tried, including so simple a procedure as an adjudication of criminal contempt with imposition of sentence postponed to see whether the contemnor has experienced a change of heart. *See United States v. Liddy, supra,* 166 U.S.App. D.C. at 304–306, 510 F.2d at 684–86 (MacKinnon, J., dissenting).

judicial power of the other, as if it had been carried physically into a different territorial sovereignty. To attempt to seize it by a foreign process is futile and void. The regulation of process, and the decision of questions relating to it, are part of the jurisdiction of the court from which it issues. 'The jurisdiction of a court,' said Chief Justice Marshall, 'is not exhausted by the rendition of its judgment, but continues until that judgment shall be satisfied.' "

In the context of successive criminal prosecutions by different sovereignties this "chief rule which preserves our two systems of courts from actual conflict of jurisdiction" means that the sovereignty which first arrests the individual acquires the right to prior and exclusive jurisdiction over him, *see, e. g., Ponzi v. Fessenden, supra,* 258 U.S. at 260–61, 42 S.Ct. 309; *Zerbst v. McPike,* 97 F.2d 253, 254 (5th Cir. 1938); *Gillman v. Saxby,* 392 F.Supp. 1070, 1072–73 (D.Haw.1975), and this plenary jurisdiction is not exhausted until there has been complete compliance with the terms of, and service of any sentence imposed by, the judgment of conviction entered against the individual by the courts of that first sovereignty. *E. g., Ponzi v. Fessenden, supra,* 258 U.S. at 261, 263, 265, 42 S.Ct. 309; *Lunsford v. Hudspeth,* 126 F.2d 653, 655, 657 (10th Cir. 1942). This exclusivity of jurisdiction does not mean, of course, that another sovereignty interested in prosecuting the individual or eliciting his testimony must necessarily stand idly by while the prisoner completes the service of the sentence imposed by the courts of the first sovereignty. For instance, pursuant to a writ of *habeas corpus ad prosequendum* [10]

or, as here, a writ of *habeas corpus ad testificandum* it is clear that the first sovereignty can, without in any way affecting the integrity of the final judgment of conviction entered there against the prisoner, "lend" its prisoner to the second sovereignty for trial on charges pending against him there or in order to have him testify in the courts of the second sovereignty. *E. g., Ponzi v. Fessenden, supra,* 258 U.S. at 265–66, 42 S.Ct. 309; *Lunsford v. Hudspeth, supra,* 126 F.2d at 655–57; *Zerbst v. McPike, supra,* 97 F.2d at 254. But any "loan" to the second sovereignty in compliance with such a writ or any other temporary transfer of custody from the sovereignty having the prior jurisdiction cannot affect in any way whatever any final judgment of conviction already entered against the prisoner there or affect the running of the sentence imposed pursuant to that judgment. *E. g., Ponzi v. Fessenden, supra,* 258 U.S. at 263, 42 S.Ct. 309; *Lunsford v. Hudspeth, supra,* 126 F.2d at 657; *Zerbst v. McPike, supra,* 97 F.2d at 254. Such a loan or temporary transfer cannot empower the courts of the second sovereignty to tamper with the terms of the first jurisdiction's valid prior judgment of conviction.

Inasmuch as Connecticut had the right of prior jurisdiction over Liberatore and had availed itself of this right by seeking and obtaining his conviction in the courts of that state, Judge Clarie had no authority to take any action against Liberatore which would interfere with the execution of that valid preexisting Connecticut judgment of conviction. Judge Clarie's order purporting to interrupt the service of Liberatore's state sentence was certainly an

---

10. We have recently noted that " '[w]hile a writ of *habeas corpus ad prosequendum* may use mandatory language, the jurisdiction to which such a writ is addressed is relied upon to cooperate in turning over the defendant to the other sovereignty.' " *United States v. Mauro,* 544 F.2d 588, 592 (2d Cir. 1976), *cert. granted,* 434 U.S. 816, 98 S.Ct. 53, 54 L.Ed.2d 71 (1977), quoting *United States v. Oliver,* 523 F.2d 253, 258 (2d Cir. 1975). If, however, both sovereignties are parties to the Interstate Agreement on Detainers, as are both the United States, 18 U.S.C.App. § 2, and the State of Connecticut, Conn.Gen.Stat. § 54–186, then the writ is a "detainer" for purposes of the Agreement, *United States v. Mauro, supra,* 544 F.2d at 592, and the sovereignty to which the request for the prisoner is directed is required to produce its prisoner for trial in the requesting jurisdiction. Of most significance for our present purposes, however, is the fact that Article V(f) of the Agreement, 18 U.S.C.App. § 2, expressly provides that the sentence imposed by the first sovereignty continues to run while the defendant is being prosecuted in the second sovereignty.

attempted modification of the precise terms of a valid final judgment entered by the state court, for, in the absence of statutory or constitutional authority to the contrary, a sentence runs continuously from its date of imposition. *See, e. g., United States v. Croft,* 450 F.2d 1094, 1097–99 (6th Cir. 1970); *Smith v. Swope,* 91 F.2d 260, 262 (9th Cir. 1937); *White v. Pearlman,* 42 F.2d 788, 789 (10th Cir. 1930); *In re Jennings,* 118 F. 479, 481–82 (C.C.E.D.Mo.1902); *Gillman v. Saxby, supra,* 392 F.Supp. at 1072–73. Moreover, once entered, such a valid final judgment based on "prior jurisdiction" may only be modified in accordance with the laws of the sovereignty whose courts imposed that judgment. *See, e. g., Lunsford v. Hudspeth, supra,* 126 F.2d at 655. It is clear here not only that Judge Clarie lacked authority to order interruption of Liberatore's state sentence but also that any such interruption would have been impermissible under Connecticut law as well, for in that sovereignty "[a] definite sentence of imprisonment commences when the prisoner is received in the custody to which he was sentenced," Conn.Gen.Stat. § 53a–38(b), and interruption of a sentence is authorized *only* in the case of an escape. Conn.Gen.Stat. § 53a–38(d). It seems clear, therefore, that not only Judge Clarie, but the courts of the State of Connecticut and obviously any state correctional officials, lacked authority to modify the terms of Liberatore's final judgment of conviction by interrupting the service of the Connecticut imposed sentence of imprisonment. It follows that the manifest invalidity of the federal court order purporting to interrupt the service of Liberatore's preexisting state sentence is not, and cannot be, cured by any unauthorized "consent" on the part of the correctional officials of the State of Connecticut to such an interruption, though we were informed at oral argument "consent" has been given. *See, e. g., Lunsford v. Hudspeth, supra,* 126 F.2d at 655, 656, 657; *Gillman v. Saxby, supra,* 392 F.Supp. at 1071–72. The remedy of the first sovereignty, the State of Connecticut, not having been exhausted, jurisdiction of the courts of that state " 'continues until [the] judgment [of the Connecticut courts] shall be satisfied,' " *Covell v. Heyman, supra,* 111 U.S. at 183, 4 S.Ct. at 358, quoting *Wayman v. Southard,* 6 U.S. 311, 314, 10 Wheat. 1, 23 (1825) (Marshall, C. J.), and the federal district court below was powerless to restrict Liberatore from satisfying the precise terms of the valid final judgment of conviction rendered against him in the State of Connecticut courts.

In summary, we affirm the order of the district court except insofar as that order purported to suspend the service of Liberatore's state sentence during the period of confinement imposed for civil contempt of the federal district court; but to the extent that the district court's order purports to interrupt the serving of Liberatore's state sentence, we reverse.

The order of the district court is affirmed in part and reversed in part.