**In the Matter of Herbert G. KELLEY, Appellant.**

No. 79–1045.

District of Columbia Court of Appeals.

Argued En Banc May 13, 1980.

Decided May 13, 1981.

W. Gary Kuhlman and Mady Gilson, Public Defender Service, with whom Andrew L. Lipps, Public Defender Service, Washington, D. C., was on the brief, for appellant. Silas J. Wasserstrom, Public Defender Service, Washington, D. C., also entered an appearance for appellant.

Charles F. C. Ruff, U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and Elliot R. Warren, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK, FERREN, and PRYOR, Associate Judges, and GALLAGHER *, Associate Judge, Retired.

GALLAGHER, Associate Judge, Retired:

This case was heard before the court en banc and in accordance with custom the opinion of the hearing division (No. 79–1045, Feb. 8, 1980) was vacated.

On August 1, 1979, a Superior Court grand jury heard testimony concerning an alleged arson which had occurred on July 9. Appellant was subpoenaed to appear before the grand jury on August 22. While there, he was served with a directive to appear in

---

* Judge Gallagher was an Associate Judge of the court at the time the case was heard. His status changed to Associate Judge, Retired, on February 27, 1981.

a lineup at Metropolitan Police Department Headquarters later that day. Acting on the advice of counsel, appellant refused to attend the lineup. As is apparent, this case involves an individual who is neither under arrest nor charged with a crime. The issue in this case necessarily involves persons who are neither defendants nor arrestees. Arrestees and defendants by definition have already had their liberty invaded but not so will it be with those involved in the issue of this case. It may well involve persons innocent of any crime.

The government sought enforcement of the grand jury's directive by filing a motion for an order requiring appellant to appear in a lineup. A hearing on the motion was held. At the hearing, appellant's counsel argued that the Fourth Amendment necessitated a showing by the government of a reasonable basis for linking appellant with the arson. The government, on the other hand, contended that recent decisions by the Supreme Court and this court reflect that no such showing is required to enforce a grand jury directive. The only facts proffered by the government at the hearing established that an eyewitness had seen the perpetrator of the arson get out of a car late at night and throw a lighted "Molotov cocktail" through the complaining witness' window. After receiving that information and hearing argument, the trial judge issued an order directing appellant to appear in a lineup.[1] Appellant has been neither arrested for, nor charged with, the arson under investigation, nor does he appear to have any other criminal charge pending.

The parties filed cross-motions for summary reversal and summary affirmance. A motions division of this court stayed the order of the trial court and ordered that the motions should be treated as the briefs of the parties. A division of this court ruled that "the Fourth Amendment does not require the government to make a prelimi-

nary showing of reasonableness when it seeks judicial enforcement of a grand jury lineup directive." *In re Herbert Kelley*, D.C.App. (No. 79–1045, Feb. 8, 1980, slip op. at 12–13), *vacated pending rehearing en banc* (March 25, 1980).

In reaching its decision, the panel relied on *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) and *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). In *Dionisio*, the Supreme Court held that "[s]ince neither the summons to appear before the grand jury nor its directive to make a voice recording infringed upon any interest protected by the Fourth Amendment, there was no justification for requiring the grand jury to satisfy even the minimal requirement of 'reasonableness.'" *United States v. Dionisio, supra*, 410 U.S. at 15, 93 S.Ct. at 772. In *United States v. Mara, supra*, decided the same day, the Court extended this holding to a grand jury directive ordering the production of handwriting exemplars. The Court's Fourth Amendment analysis in these cases was two-tiered. It concluded first that the initial grand jury subpoena ordering a person to appear before it is not a Fourth Amendment "seizure" because of "the historically grounded obligation of every person to appear and give his evidence before the grand jury." *United States v. Dionisio, supra* at 9–10, 93 S.Ct. at 769–770. Relying on its earlier pronouncement in *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that the Fourth Amendment provides no protection for "[w]hat a person knowingly exposes to the public, even in his own home or office . . . ," *United States v. Dionisio, supra*, 410 U.S. at 14, 93 S.Ct. at 771, the Court concluded further that orders to supply handwriting and voice exemplars did not infringe upon the appellant's Fourth Amendment rights.

---

1. The court did grant appellant's request that the lineup be "sanitized." This means that (a) appellant is not to be searched at the lineup; (b) only police officers and civilians (as opposed to inmates or other persons under investigation) are to be included as "fillers" in the lineup; (c) appellant is to be viewed only by witnesses to the offense being investigated; and (d) any photographs of the lineup must be destroyed in the event that appellant is not indicted.

The hearing division in this case stated that "[t]he Supreme Court's decisions in *Dionisio* and *Mara* essentially are dispositive of any case in which the government seeks judicial enforcement of a grand jury directive to produce evidence of a 'physical characteristic' that is 'constantly exposed to the public.'" *In re Kelley, supra,* slip op. at 7. Rejecting appellant's argument that a lineup is an inherently greater affront to a person's dignity and privacy than are orders to produce handwriting or voice exemplars, it reasoned: "[t]o distinguish a grand jury-initiated lineup order from the orders sanctioned in *Dionisio* and *Mara* (and from an order directing a person to pose for a 'mug' shot, which appellant concedes would be permissible) would be, we think, to draw a hairline distinction lacking a rational Fourth Amendment basis." *Id.* at 10. This court granted appellant's petition for a hearing en banc and vacated the panel opinion.

### I

In earlier years in this jurisdiction, and others as well, in order to obtain a lineup order the investigating officer was required to have probable cause to arrest. With the advent of *Wise v. Murphy,* D.C.App., 275 A.2d 205 (1971), that standard was lessened. *Wise* held that in order to obtain a lineup order the government need only articulate, as in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), reasons why a lineup order is reasonable. Thus, it was no longer necessary to display probable cause to arrest but only reason to suspect. Now, we must decide whether no showing whatsoever need be made by the government to obtain judicial enforcement of a lineup order emanating from the grand jury. This is a large leap to make in one decade—to move from a required showing of probable cause to arrest to no showing at all.

The government candidly told us at oral argument that it has put our decision in *Wise v. Murphy, supra,* in "mothballs." The *Wise v. Murphy* procedure has been invoked when police investigators sought a lineup order in aid of their investigation of a crime. As related at oral argument, due to the intervening Supreme Court decisions in *United States v. Dionisio, supra,* and *United States v. Mara, supra,* the government ignores the *Wise v. Murphy, supra,* procedure. The government now passes such police requests through the grand jury and thereby obtains grand jury lineup directives. By this grand jury "pass-through" technique, the government avoids making even the moderate showing on the reasonableness of the lineup order required by our decision in *Wise v. Murphy, supra.* The government essentially contends that this "pass-through" procedure was validated by *United States v. Dionisio, supra.* We do not think so.

We are unpersuaded by the government's arguments that a lineup appearance involves no greater intrusion than the orders in *Dionisio* and *Mara.* We note first that those cases held only that the Fourth Amendment is not infringed upon by a summons to appear before a grand jury nor by any order to supply it with evidence of physical characteristics. *Dionisio* and *Mara,* however, did not decide whether the nature of the lineup process may be so intrusive on a witness' expectation of privacy as to implicate the Fourth Amendment protection against unreasonable searches and seizures. Those decisions do not control here. A lineup appearance is not simply showing one's face to the public. It involves considerable social stigma and personal risk. It entails the humiliation of standing on a stage under floodlights, removed from counsel, subject to being compelled to speak certain words and perform actions directed by the police, all at considerably more risk of mistake and misidentification than the more scientifically grounded fingerprinting and, to some extent, voiceprinting techniques involved in *Dionisio* and *Mara.* *See In re Toon,* D.C.App., 364 A.2d 1177, 1178 (1976) (separate statement), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1120, 51 L.Ed.2d 548 (1977). Lineups are, of course, vital to criminal law enforcement. Nevertheless, as the Supreme Court stated in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967):

The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.

\* \* \* \* \* \*

Moreover, "[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial." [*Id.* at 228–29 [87 S.Ct. at 1933], quoting Williams & Hammelmann, *Identification Parades* (pt. 1), [1963] Crim.L. Rev. 479–82 (footnotes omitted).]

Moreover, the Supreme Court has indicated that in the Fourth Amendment area the taking of fingerprints is not necessarily equitable with a lineup appearance. *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969).

A comparison with the procedures surrounding subpoenas duces tecum illustrates that the intrusiveness of the method used to obtain grand jury-ordered evidence is a legitimate subject of inquiry by an enforcing court. In *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), the Court ruled that although a grand jury may order the production of books and papers, such an order under certain circumstances may constitute an unreasonable search and seizure within the Fourth Amendment. *Id.* at 76, 26 S.Ct. at 379. Persons and corporations commonly move to quash subpoenas duces tecum as being too broad and oppressive and therefore constitutionally impermissible under the Fourth Amendment and are routinely afforded thoroughgoing hearings, despite the resultant delay to the grand jury investigations. *See, e. g., United States v. Nixon*, 418 U.S. 683, 698, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974); *United States v. Calandra*, 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974); *United States v. Dionisio, supra* 410 U.S. at 11–12, 93 S.Ct. at 770–771; *See v. City of Seattle*, 387 U.S. 541, 544, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967); *Hale v. Henkel, supra* ; Super.Ct. Cr.R. 17(c). It is a common occurrence in antitrust cases. Surely,

[i]t would seem a strange hierarchy of constitutional values that would afford papers more protection from arbitrary governmental intrusion than people. [*Dionisio, supra* [410 U.S.] at 40 [93 S.Ct. at 785] (Marshall, J., dissenting).]

## II

We conclude, however, that this issue should be decided on non-constitutional grounds. *See Massachusetts v. Wescott*, 431 U.S. 322, 323, 97 S.Ct. 1755, 1756, 52 L.Ed.2d 349 (1977). Instead, we invoke our inherent supervisory power over the Superior Court, which in turn supervises the grand jury. The government acknowledges that subsequent to the Supreme Court decisions in *Dionisio* and *Mara*, it has utilized the grand jury process to obtain lineup orders, thus avoiding the moderate showing of reasonableness required by *Wise* when the prosecutor alone seeks a lineup order. We are concerned here, therefore, with avoiding the appearance of, or the potential for, abuse of the grand jury system which may result from a commingling of the separate responsibilities of grand jury, prosecutor, and judge. Consequently, to insure that the prosecutor and the grand jury are acting in good faith and not arbitrarily or to harass putative defendants, we hold that a prosecutor seeking judicial enforcement of a grand jury directive to appear in a lineup must, by affidavit of law enforcement officer or a formal representation of an Assistant United States Attorney, make a minimal factual showing sufficient to permit the judge to conclude that there is a reason for the lineup which is consistent with the legitimate function of the grand jury.

The Supreme Court recognized in *Dionisio* "[t]he grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." 410 U.S. at 17–18, 93 S.Ct. at 773. Grand juries are necessarily guided to a great extent by prosecutors. Accordingly, some degree of

judicial supervision before enforcement of a grand jury's directive is required to prevent the possibility of, or the appearance of, abuse.

We emphasize that this procedure would not entail still another pretrial hearing and thus would not add another mini-trial to the criminal justice process, a problem which pointedly concerned the Supreme Court in *Dionisio* and *Mara*. *United States v. Dionisio, supra* 410 U.S. at 17,[2] 93 S.Ct. at 773. We are requiring a minimal showing.

As the concurring opinion perceptively observed in *In re Grand Jury Proceedings*, 486 F.2d 85 (3d Cir. 1973) (*Schofield I*), significantly enough both in *Dionisio* and *Mara* the government had previously made a proper purpose showing before the trial judge. We agree with the view expressed in that opinion that a minimal showing such as we are here requiring is by no means incompatible with *Dionisio* and *Mara*.

As we have related, we impose this requirement pursuant to our supervisory power over the Superior Court and its power to convene grand juries and enforce their subpoenas. *See* Super.Ct.Cr.R. 6(a); 6(e)(3)(C)(ii); and 17(g). It is fundamental that the trial court has supervisory power over the grand jury. *United States v. Moultrie*, D.C.App., 340 A.2d 828 (1975); *United States v. Dionisio, supra*. This court, as the reviewing authority, has the same power.

In so holding, we note that a similar procedure was adopted by the Third Circuit in a case involving an order closely approaching the ones issued in *Dionisio* and *Mara, supra*. In *Schofield I, supra*, that court, in dealing with a grand jury order to provide handwriting exemplars, fingerprints and a photograph, ruled pursuant to its supervisory power over the District Court's use of its process to enforce grand jury directives, and the substantive and procedural law of civil contempt, that the government must make some preliminary

showing before the District Court would enforce the grand jury's directive. Conceding that a presumption of regularity attaches to a grand jury subpoena and that "[g]iven that presumption, the party objecting to enforcement has the burden of making some showing of irregularity," *id.* at 92, the court nevertheless reasoned:

Usually, however, and almost universally in the case of grand jury subpoenas, all the relevant information is in the hands of the government enforcement agency. Here the administrative subpoena cases give guidance on that problem, for courts have recognized that a party seeking to show an abuse of the subpoena process can use discovery proceedings to meet his burden. *See United States v. Newman*, 441 F.2d 165 (5th Cir. 1971); *United States v. Salter*, 432 F.2d [697] at 700 [(1st Cir.)]; *United States v. Roundtree*, 420 F.2d [845] at 852 [(5th Cir.)]. Complicating the discovery problem in grand jury subpoena cases, however, is Fed.R. Crim.P. 6(e), providing for secrecy of matters occurring before the grand jury.

     *     \*     \*     \*     \*     \*

Certainly the fact of grand jury secrecy suggests that the party seeking enforcement of a grand jury subpoena be required to make some minimum showing of the existence of a proper purpose before it can trigger the enforcement machinery of the judicial branch. [*Schofield I, supra* at 92.]

The court therefore concluded:

In view of the fact that information which would justify obtaining the handwriting exemplars, fingerprints, and a mug shot, is in the Government's sole possession, we think it reasonable that the Government be required to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose. [*Id.* at 93.]

---

2. The courts of appeals in both *Dionisio* and *Mara* had ruled that the witnesses should be afforded adversary hearings to resist the government's requests. *United States v. Dioni-*

*sio, supra* 410 U.S. at 30–31, 93 S.Ct. at 780–781 (Douglas, J., dissenting). But we here require only a summary factual showing from the government and not a hearing.

In both *Schofield I* and a later case involving the same parties, *In re Grand Jury Proceedings*, 507 F.2d 963 (3d Cir.), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975) (*Schofield II*), the Third Circuit pointed out that because its decisions involved supervisory power over the propriety and legitimacy of grand jury subpoenas, and nonconstitutional objections to their enforcement, *Schofield I, supra* at 89, 93, the decisions marked "no radical departure" from *Dionisio* and *Mara* and were in fact "perfectly compatible" with them. *Schofield II, supra* at 966. In *United States v. Oliva*, 611 F.2d 23 (3d Cir. 1979), the Third Circuit reiterated the distinction between the grand jury's issuance of a subpoena and the subsequent involvement of the judicial system in its enforcement, stating: "[t]he enforcement proceeding, not the issuance of the subpoena, is the triggering event for the affidavit requirement." *Id.* at 25 (emphasis added).[3]

An interesting opinion on this score was issued by the First Circuit recently in *In re Pantojas*, 628 F.2d 701 (1980). There, the court stated:

> Appellant urges us to adopt the supervisory role adopted by the Third Circuit in *In re Grand Jury Proceedings*, 486 F.2d 85 (1973) (*Schofield I*). That court, incident to its general supervision of federal grand juries, *see In re Grand Jury Proceedings*, 507 F.2d 963 (3d Cir. 1975) (*Schofield II*), requires the government to make some initial showing that the information sought by the grand jury is relevant and for some proper purpose be-

fore a court will order the witness to provide the evidence. We have heretofore postponed consideration of whether we would adopt a supervisory rule similar to that announced in *Schofield*. *See In re Lopreato*, 511 F.2d 1150, 1153 (1st Cir. 1975). Although we believe that the procedures mandated by the Third Circuit have much to recommend them, especially as glossed by Chief Judge Seitz in his concurrence in *Schofield I*, 486 F.2d at 94, we decline to impose them on district courts within the circuit at this time. The practical responsibility for controlling grand jury excesses lies with the district court, on which the grand jury must rely *for subpoena and contempt procedures*. We have seen little to convince us that prosecutors are regularly overreaching or that the district courts have been insensitive to irregularities that may occur. Without some convincing demonstration to us that these procedures are necessary to prevent systematic abuse, we are reluctant to give recalcitrant grand jury witnesses further opportunities for delay. *District courts should, however, feel free to require such showings by the government as a means of assuring themselves that grand juries are not overreaching, or simply as a means of removing the issue of sufficiency of nexus from dispute.* [*Id.* at 704–05 (emphasis added).]

In *Schofield I*, *Schofield II*, and *In re Pantojas, supra*, the courts were dealing with *Dionisio* and *Mara* material. The facts

**3.** This approach is not new to this court. In *Christian v. United States*, D.C.App., 394 A.2d 1 (1978), *cert. denied sub nom. Clark v. United States*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979), we stated:

> The absence of constitutional infirmities does not necessarily preclude a challenge to the subpoena in an enforcement proceeding, however. A subpoena may be resisted where the grand jury acts without authority, where the subpoena seeks information unrelated to the grand jury's investigation or where the subpoena endeavors to gather evidence *primarily* for another purpose. *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (1973), *aff'd after remand*, 507 F.2d 963 (3d Cir. 1975); *see also United States v. Moultrie*,

D.C.App., 340 A.2d 828, 832 n.2 (1975). [*Id.* at 46.]

Some federal appellate courts have declined to adopt the *Schofield* approach. *See In re Liberatore*, 574 F.2d 78 (2d Cir.1978); *In re Grand Jury Investigation*, 565 F.2d 318 (5th Cir. 1977) (*McLean*); *In re Grand Jury Proceedings*, 555 F.2d 686 (9th Cir. 1977) (*Hergenroeder*). These cases, however, did not involve lineups and significantly in two of the decisions the court expressly found that the government had supplied sufficient information to meet the test we adopt here. *See Liberatore, supra* at 83; *McLean, supra* at 320. The latter is a significant consideration and is not present in the instant case.

here are more persuasive as we have before us a lineup order which, as we have stated, has implications going considerably beyond an order requiring fingerprints or voiceprints. We come more nearly to the situation discussed by the First Circuit in *In re Pantojas, supra,* where the court encouraged an initial showing by the government in cases where the court felt it wise to assure itself that grand juries are not overreaching. Because of the statement by the government that the procedure established by this court at the government's request in *Wise v. Murphy, supra,* has been rejected in favor of the now prevailing grand jury "pass-through" technique, we conclude that the more important considerations are the good faith use of court processes and the integrity of the grand jury. We have authority under our inherent supervisory power over the trial court, which in turn has supervisory authority over its grand jury, to require in summary terms a minimal showing of a legitimate basis for requiring the particular lineup where enforcement of a grand jury directive is before the court. This procedure does not authorize an adversary hearing and does not encumber the grand jury machinery.

*Reversed and remanded for further proceedings in accordance with this opinion.*

NEBEKER, Associate Judge, with whom HARRIS, Associate Judge, joins, concurring in part:

I concur in the opinion of the court except for Part I. There, without deciding the constitutional question, the opinion undertakes a comparative analysis of lineup, voiceprint, and handwriting exemplar situations. I submit that the lineup process is no different than the handwriting or voiceprint procedures deemed beyond the Fourth Amendment in *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), and *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). The lineup does nothing more than require the suspect to display what he displays every day of his life to the public—his appearance. The infringements on liberty, if they are deemed such, and they seem not to be in *Dionisio* and *Mara,* are not meaningfully different. In either event, the suspect must deviate from daily routine to accommodate the order of the grand jury by going to a place not of his choosing, operated under police auspices, and there provide evidence not within the ambit of the Fourth Amendment. Despite the analytical commentary about the nature of a lineup, the court is not holding that a constitutional—*viz.,* Fourth Amendment—difference exists between lineups and the displays of voice and writing characteristics not protected by that amendment.

To the extent that Part I of the opinion notes that lineups are less than scientifically accurate and thus seeks to distinguish *Dionisio* and *Mara,* I would observe that lack of reliability of the evidence obtained is irrelevant to the question whether the grand jury process may be used to obtain it. Lack of reliability may, however, go to the issue of admissibility *vel non.* See *Brown v. United States,* D.C.App., 384 A.2d 647 (1978).

It should also be noted that the language quoted in Part I from *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), characterizing lineup procedures, is inapplicable in the context of our holding in this case. In *Wade,* the Supreme Court was referring to uncounseled and potentially suggestive lineups conducted in private by police. It was that kind of lineup which the Supreme Court eliminated by its decisions. All lineups conducted today in this jurisdiction, including the so-called "sanitized" ones held at grand jury behest, are attended by counsel and none has been authoritatively held to be suggestive.